COMMONWEALTH *vs.* CLARENCE H. WILLIAMS.

Berkshire.    March 15, 1923. — April 13, 1923.

Present: RUGG, C.J., BRALEY, DE COURCY, CROSBY, & PIERCE, JJ.

*Homicide.    Evidence*, Opinion: experts; To impeach credibility; Of conviction;
  In cross-examination; In rebuttal.    *Witness*, Impeachment.    *Practice, Crim-
  inal*, Exceptions.

At the trial of an indictment for murder in the second degree, it appeared that in
  an early morning in June the victim was found, badly beaten up about the
  head and face and unconscious, lying by the roadside about three fourths of
  a mile from the home of the defendant, and that he died early that afternoon.
  Expert physicians, present at the autopsy, testified to a large blood clot on
  the upper part of the left hemisphere of the brain and they were of the opinion
  that the death was due to this clot and that the clot was caused by blows,
  apparently of a club, dealt on the left side of his face over the eye.    Investi-
  gations by police officers tended to eliminate an accident as the cause of the
  victim's condition.    There was evidence tending to show that the victim was
  with the defendant the night before he was found, that sounds of quarelling
  were heard and the voices of the two were recognized, and that there was a
  sound of "something heavy falling;" that a person who thereafter passed
  along the highway had seen a man's body lying with his hands over his face
  beside the road one hundred and eighteen feet from the defendant's house, at
  which place, later, considerable blood and heel tracks such as would be made
  by shoes worn by the defendant were found; that, later, lights were seen in the
  defendant's house, a light drawn wagon was heard passing down the road
  toward the place where the body was found, and the barking of dogs was
  heard near that place; that the victim, after receiving the blows from which
  he had died, could not have walked that far; that, subsequent to the discovery
  of the victim, a spot was found on the floor of the defendant's kitchen, about
  two feet square, which apparently had been recently scrubbed and cleaned up;
  that the victim's cap was found in the defendant's yard about eighteen feet
  from the piazza and in the corner of the piazza was a baseball bat on which
  were blood spots and some gray hairs.    Statements made by the defendant
  at various times were conflicting and some of them were incriminating.    He
  was found guilty of manslaughter.    *Held*, that the verdict was warranted.
At the trial of the action above described, an attempt was made by the defendant,
  by a comparison of testimony of government witnesses in the police court
  at the hearing on the question, whether the defendant should be held for the
  grand jury, with their testimony at the trial of the indictment, to discredit
  their testimony at the trial as a recent invention, or to show that the prose-
  cution had unfairly suppressed evidence at the preliminary hearing.    To rebut
  such inferences the district attorney asked the judge of that court, who had
  been called by the defendant, whether it was customary for the Commonwealth
  to present in his court only sufficient evidence to hold the accused for the grand

jury, and he answered, "It is." The qualification of the judge to testify to the practice was admitted by the defendant. *Held*, that the testimony was admissible for the limited purpose of explaining away the inferences which the defendant was attempting to establish.

It was proper at the trial above described to exclude a further question, asked of the judge of the police court, whether a question, asked of one of the witnesses at the hearing before him, "Is there anything else about this case?" was not broad enough to admit any further information that the witness had about the case, the scope of that question being as apparent to the jury as to the witness, whose opinion on the subject was immaterial.

In view of the attempts to show that the testimony of one of the government's witnesses was of recent invention, the judge of the police court properly was permitted to testify as to an explanation given by the witness at the hearing before him of why he had overlooked an important piece of real evidence in the defendant's presence.

At the trial above described the defendant was asked on cross-examination as to certain former convictions. On objection being made to the form of the questions, they were framed substantially in a form suggested by the defendant's counsel. No objection was made at the trial that the records themselves were not put in evidence. The district attorney had the records in his hand while interrogating the defendant with reference to them; and the judge examined them, considered them as in evidence, and treated them accordingly in his charge. No request was made that they be sent to the jury, and the fact that they were not formally marked as exhibits was not called to the attention of the judge. *Held*, that the defendant could not for the first time before this court on exceptions take advantage of the failure to mark the records of conviction as evidence, and that his substantial rights were not prejudiced by such failure.

At the trial of the indictment above described, it was *held*, that it was proper to allow to be answered a hypothetical question, put in cross-examination to an expert physician called by the defendant, which in a detailed statement assumed, as the basis of the opinion sought, facts which were in evidence.

A question asked, at the trial above described, in direct examination of an expert physician called by the defendant, "What, in your opinion, caused the death?" rightly was excluded, where the question did not include a statement of the facts upon which the witness was expected to base his opinion and both the medical and the other evidence at the trial were conflicting.

There was no prejudicial error in permitting an expert physician who had testified for the defendant to be asked in cross-examination, "Do you recall any instance in which . . . [an expert called by the Commonwealth] had said that death from cerebral hemorrhage was due to injury that you held any other opinion," especially when the answer was "I don't remember" and the witness later said, "I can't say that I have in cases that he autopsied. I know I have differed where the autopsy has not been made, where he didn't make the autopsy."

The defendant at the trial above described had testified in cross-examination that on the Friday preceding the Monday when the victim was found he had not beaten his wife, nor had he on any other day, and he and his wife both had testified that they were not at home on that Friday. In rebuttal a neighbor had been permitted to testify that on that Friday she was at home and went

over to the defendant's house because she heard the defendant's wife screaming for help; that the defendant "was just standing there" and his wife was standing beside him crying; that she told the defendant that he must stop beating his wife and he told the witness to get off the place and took a hoe from the side of the porch and chased her off the place with it. The defendant excepted to this testimony. *Held,* that it was admissible in the discretion of the trial judge.

INDICTMENT, found and returned in July, 1921, charging the defendant with the murder of Louis C. Decker. Previous to the trial, the charge by disclaimer on the part of the Commonwealth was reduced to murder in the second degree.

In the Superior Court, the case was tried before *Wait,* J. Material evidence and exceptions saved by the defendant are described in the opinion.

The question asked of Dr. Dodd and referred to in the first part of the paragraph of the opinion numbered 6, with the answer, was:

"Now if you found a man lying beside the road-side, with two black eyes, one of them entirely closed and the other almost closed, bruises on his nose, bruises on the back of his right hand, and bruised marks on his elbow and between his hand and elbow, and if he had been lying there fourteen hours and then died, and when you took his skull off and found a large blood clot covering all the left hemisphere of the brain, at its maximum thickness three quarters of an inch thick and it was all entirely between the dura-mater and the pia-mater, and it all slid right off without adhering to anything, would you think there [was] any chance of that clot having been due to apoplexy?" The doctor's answer was: "It would not be apoplexy." The witness later stated that a man with apoplectic condition might be killed from exterior blows with the slight contributing cause of apoplexy; that, broadly speaking, any clot of blood inside the head that causes death can be called apoplexy.

The answer of Dr. Donoghue to the question referred to in the last part of the paragraph of the opinion numbered 6 was, "I don't remember;" and later he said, "I can't say that I have in cases that he autopsied. I know I have differed where the autopsy has not been made, where he didn't make the autopsy."

The defendant, without objection, had testified on cross-examination that he had not beaten his wife on the Friday pre-

ceding the Monday on which the homicide occurred nor on any other day and that neither he nor she were home that day. His wife had testified that she had not been at her house that day. The testimony of Mabel Kinsella in rebuttal was that the Friday before Decker was injured she was at her father's house and went over to Williams's because she heard Mrs. Williams screaming for help; that "Williams was just standing there and she was standing beside him crying;" that the witness told Williams that he must stop beating his wife, and that he told the witness to get off the place and that he took a hoe from the side of the porch and chased her off the place with it.

The jury found the defendant guilty of manslaughter; and the defendant alleged exceptions.

*R. M. Stevens,* for the defendant.

*C. H. Wright,* District Attorney, for the Commonwealth.

DE COURCY, J. The defendant was tried for the murder in the second degree of Louis C. Decker, and was found guilty of manslaughter. The exceptions before us relate to the admission and exclusion of evidence, and to the judge's refusal to direct a verdict of acquittal.

1. There was evidence to warrant a finding that the defendant was guilty. The jury could find the following material facts, on the direct and circumstantial evidence: On the morning of Monday, June 6, 1921, at about a quarter of seven o'clock, Decker was found lying in the grass at the edge of a highway in Stockbridge, near the house of one Henry. He was unconscious, and remained so until his death early that afternoon. Both his eyes were discolored, there was a depression on his forehead over the left eye, and bruises or abrasions appeared on his face, left forearm, and the back of his right hand. He was bleeding from the nose and mouth; and there was blood across the front of his vest, and on some other parts of his clothing. An autopsy, held the next morning, disclosed a large blood clot on the upper part of the left hemisphere of the brain. In the opinion of the doctors who were present at the autopsy, and of other medical expert witnesses, Decker's death was due to this clot; and the clot was caused by blows, apparently of a club, dealt on the left side of his face over the eye.

Investigation by the officers tended to eliminate an accident

as the cause of Decker's condition. At about nine o'clock on the night of Sunday, June 5, Decker was seen entering the defendant's house. Later some of the neighbors heard loud talking there, and recognized the voices of Decker and the defendant. Williams was using profane language. A witness, Kinsella, who lived across the road and was sitting on his porch that evening testified: "I heard some awful noise about ten minutes before I went, as though some one was fighting or tumbling on the floor, something heavy falling." When this witness went to bed, soon after eleven o'clock, the "voices had stopped altogether." Later he was awakened from sleep by the barking of dogs, his own and those of the defendant. At about 11:30, one Campion while walking home, and when near the defendant's house, heard a groan; and turning back, he saw the body of a man lying with his arms over his face, by the side of the road, diagonally across and about one hundred and eighteen feet from the defendant's house. He noticed a light in that house. He proceeded on his way, but met no one on the road. At about 1:15 A.M. a neighbor, Mrs. Van Zandt, heard some one rapping at her door, and later at the defendant's door; and she saw a light in the defendant's house upstairs. Between one and two o'clock in the morning a light drawn wagon was heard passing the Kinsella house; and the barking of dogs was heard near the Henry house, where Decker was later found. This place was about three fourths of a mile from the defendant's house; and in the opinion of the physicians, Decker could not have walked that distance. In the afternoon of Monday, the day before the autopsy, officers called at the defendant's house with search warrants for liquor; and they examined the place again subsequently. A spot on the floor of the kitchen, about two feet square, apparently had been recently scrubbed and cleaned up. In the grass, where the witness Campion had seen a man prostrate, there was considerable blood; and heel tracks such as would be made by the shoes worn by the defendant were seen in the mud. Decker's cap was found in Williams's yard, about eighteen feet from the piazza. In the corner of the piazza was a baseball bat on which were blood spots and some gray hairs. Various statements were made by the defendant which were conflicting and incriminating. For instance he at first denied that Decker had been at his house

on Sunday evening, but later admitted that he was there and drank some liquor. After saying that he last saw Decker at half past nine Sunday night, he said that Decker rapped at his door at 1:30 next morning. When Williams was arrested on the liquor warrant, and before any accusation had been made with reference to the death of Decker, he said to his wife: "they have got me for killing Decker." Without recital of other details it is clear that the case was rightly submitted to the jury. *Commonwealth* v. *Russ*, 232 Mass. 58.

2. Witnesses for the Commonwealth were cross-examined about their testimony in the Lee Police Court, in order to show that they were adding thereto. The purpose presumably was to discredit their testimony at this trial, as a recent invention, or to show that the prosecution had unfairly suppressed evidence at the preliminary hearing. With a view to rebut such inference, the district attorney asked Judge Bossidy of the Lee court, a witness called by the defendant, whether it was customary for the Commonwealth to present in his court only sufficient evidence to hold the accused for the grand jury, and he answered, "It is." Counsel for the defendant admitted that the judge was "familiar with the practice," but objected to the testimony. It was rightly admitted for the limited purpose of explaining away the inferences which the defendant was attempting to establish.

3. The witness Bossidy testified that in the Lee court the inquiry was made of one Stannard: "Is there anything else, Mr. Stannard, about this case?" The witness was then asked "whether this question was not broad enough to admit any further information that Mr. Stannard had about this case?" There was no error in excluding this question. The scope of the question was as apparent to the jury as to the witness, whose opinion on the subject was immaterial. *Commonwealth* v. *Tucker*, 189 Mass. 457, 486.

4. The testimony of the same witness as to what Stannard said in the Lee court, in explaining why he overlooked the baseball bat, was properly admitted in view of the attempt to show that Stannard's testimony was largely of recent invention. *Griffin* v. *Boston*, 188 Mass. 475. *Commonwealth* v. *Marshall*, 211 Mass. 86.

5. The defendant was asked as to certain former convictions. On objection being made to the form of the questions, they were framed substantially in the form suggested by the defendant's counsel. It is now argued that the records themselves were not put in evidence. No such objection was made at the trial; the district attorney had them in his hand while interrogating the defendant with reference to them; and the judge examined them, considered them as in evidence, and treated them accordingly in his charge. No request was made that they be sent to the jury, and the fact that they were not formally marked as exhibits was not called to the attention of the court. The defendant cannot now for the first time take advantage of this failure, nor were his substantial rights prejudiced thereby. See *Root* v. *Hamilton,* 105 Mass. 22; *Commonwealth* v. *Sullivan,* 150 Mass. 315.

6. No error is shown in admitting the hypothetical question to Dr. Dodd, on cross-examination. The interrogatory to the expert witness Dr. Donoghue "What, in your opinion, caused the death of Decker?" was rightly excluded. The facts upon which he was expected to base his opinion were not stated; and both the medical and other evidence were conflicting. *Connor* v. *O'Donnell,* 230 Mass. 39, 42. We find no prejudicial error in allowing this witness to be asked in cross-examination, "Do you recall any instance in which Dr. McGrath [an expert called by the Commonwealth] had said that death from cerebral hemorrhage was due to injury that you held any other opinion?" especially in view of the answer that was given.

7. The testimony of Stannard, of officer White, and of Dr. McGrath, was admissible in rebuttal, either in contradiction of testimony offered on behalf of the defendant, or in the discretion of the court. With some hesitation we reach the same conclusion as to the testimony of Mabel Kinsella, offered in rebuttal. *Bennett* v. *Susser,* 191 Mass. 329.

What we have said disposes of all the exceptions argued by the defendant. We consider the others as waived.

*Exceptions overruled.*