COMMONWEALTH *vs.* WILFRED ROY FRENCH.
(and five companion cases [1]).

Suffolk. January 5, 1970. — May 4, 1970.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Practice, Criminal,* Trial of defendants together, Disclosure of evidence, Newspaper article, Argument by prosecutor, Remark by judge, Remark by counsel, Charge to jury, Discretionary control of evidence, Capital case, Disclosure of prospective witnesses, Access to witnesses, Fair trial, Plea of codefendant, Deliberation of jury. *Evidence,* Admissions and confessions, Of conspiracy, Acts and declarations of conspirator, Common criminal enterprise, Res gestae, On cross-examination, Relevancy and materiality, Cumulative evidence, Attorney-client privilege, Prior inconsistent statement, Judicial discretion, Testimony of accomplice, Presumptions and burden of proof, Prior conviction, Credibility of witness. *Constitutional Law,* Confrontation of witnesses, Admissions and confessions, Assistance of counsel. *Statute,* Retroactive statute. *Error,* Whether error harmful. *Entrapment. Accessory. Jury and Jurors. Homicide. Conspiracy. Pleading, Criminal,* Bill of particulars. *Witness,* Credibility.

At a joint trial against six defendants on murder charges and conspiracy charges, there was no error under *Bruton* v. *United States,* 391 U. S. 123, in the denial of motions by them, respectively, during the trial for severance based on the admission of certain out-of-court statements alleged to violate the right of cross-examination secured by the confrontation clause of the Sixth Amendment of the United States Constitution, where it appeared that no defendant confessed, that four defendants took the stand, and that the statements were originally limited in their personal application and did not contain charges against defendants not present when the statements were made sufficiently definite to require severance. [371–372, 375]

St. 1968, c. 721, § 2, inserting § 2A in G. L. c. 278, and effective only after completion of a certain trial together of capital cases and of conspiracy cases, was not retroactive so as to have required separate trials of the capital cases and the conspiracy cases. [375–376]

Severance of trials of several defendants indicted on capital charges and conspiracy charges was not required because of the disparity at a joint trial between the aggregate number of peremptory challenges to which the Commonwealth would be entitled and the number of peremptory challenges to which each defendant would be entitled [376];

---

[1] The other defendants are Lewis Grieco, Henry Tameleo, Joseph L. Salvati, Ronald Anthony Cassesso, and Peter Joseph Limone.

Commonwealth *v.* French.

or because the defendants might assert antagonistic defences or use different trial strategy. [376]

There was no abuse of discretion at a long joint trial of indictments against several defendants in permitting the trial to continue after frequent clashes between participants in the trial and admonitions of counsel by the judge. [376–377]

Upon indictments for serious offences, there was no error in a denial of motions by the defendants for access to the grand jury minutes in advance of trial. [377]

There was no abuse of discretion at the trial of indictments in denial of motions for the grand jury minutes of the testimony of a trial witness where the motions were made at the close of his direct examination and before certain testimony on cross-examination relied on by the defendants as showing a "particularized" need for the minutes, and the motions were not subsequently renewed after such testimony on cross-examination [377–378]; or in denial of motions for the grand jury minutes of testimony of another trial witness where the motions were not adequately pressed after the judge had examined the minutes and the defendants did not show prejudice [378].

At a joint trial of defendants indicted for conspiracy, where it appeared that the central figure of the conspiracy testified as to conversations he had had with, and admissions made to him by, each defendant, and that at the end of the direct testimony of that witness the conspiracy had been adequately shown, out-of-court statements made by any defendant in furtherance of the conspiracy were then admissible against all defendants, although particular defendants had not been present when statements incriminating them were made. [378–379]

At the trial of a defendant as an accessory before the fact to a murder and for conspiracy to murder, where the judge in his charge stated that he had found sufficient evidence of a conspiracy "for the consideration of the jury" and that anything any member of the conspiracy did or said in furtherance thereof bound all of the conspirators, there was no merit in a contention by the defendant that out-of-court statements by his coconspirators should be applied only to the conspiracy indictments against him, where the evidence of a common enterprise to murder went beyond mere conspiracy. [379–380]

With respect to testimony of a conspirator given at a joint trial of defendants on murder charges and conspiracy charges before a finding of conspiracy or common enterprise would have been warranted, in which the witness told of conversations he had with defendants, no prejudice to any defendant resulted where the judge adequately limited the admissibility of many such conversations to the particular defendants with whom the witness conversed, and, as to his conversations concerning which no limiting instructions were given, some of such conversations were completely harmless, some were admitted without adequate exception, and some were admitted without any request for limiting instructions. [380–382]

At the trial of capital cases and conspiracy cases, any error in allowing a conspirator to state on direct examination that he would not have

Commonwealth *v.* French.

proceeded with the criminal plans if a certain defendant had not authorized him to do so was harmless where the witness had so told that defendant and the statement added little to other evidence. [382]

At the trial of indictments arising out of a murder and a conspiracy to murder the victim and a conspiracy to murder a companion of the victim, testimony by the companion as to his talks with the victim when none of the defendants was present was erroneously admitted as res gestae, but no prejudice resulted since the talks were in large part consistent with other relevant testimony properly admitted; likewise, no prejudice resulted from testimony by the companion of his conversations with the central figure of the conspiracies after the conspiracies had ended, which were admitted to contest any suggestion of recent contrivance or were largely irrelevant. [382–383]

At the trial of indictments arising out of a murder and a conspiracy to murder the victim and a conspiracy to murder a companion of the victim, certain cross-examination of a detective in the District Attorney's office called by a defendant as his own witness was appropriate to rebut any inference from the detective's direct examination that testimony of the companion had been suggested in part by a coconspirator of the defendant after the conspiracies had ended. [383–384]

At the trial of indictments as accessory before the fact to murder and for conspiracy to murder, there was no error under *Massiah* v. *United States*, 377 U. S. 201, in the admission of testimony by a prisoner that after the defendant had been indicted an intermediary of the defendant "told" the prisoner to confess falsely to the murder and threatened his life if he did not, whereupon the prisoner went to the F.B.I. and at its suggestion talked with the defendant about the murder and pretended to go along with the proposal of the false confession in order "to get . . . information for the F.B.I." where the prisoner's talks with the defendant were largely cumulative of what he had already been told by the intermediary and the prisoner merely allowed the defendant to continue his criminal efforts and reported them without any entrapment. [386]

At a joint trial of defendants indicted as principals in, or accessories before the fact to, a murder and for conspiracy to murder the victim, where the judge instructed a witness not to use the words "office," "Cosa Nostra" or "they" in describing the persons responsible for, or connected with, a proposal that he falsely confess to the murder, and no individual was described as a member of the "office," there was no merit in a contention by the only defendant against whom the witness made a charge by name that such instruction unduly restricted his efforts upon cross-examination to show that the witness's testimony was false or inaccurate. [387–389]

At the trial of indictments against defendants who were in custody for the crimes alleged when the automobile of an attorney representing an accomplice coöperating with the government authorities was bombed, and who were not shown to have been responsible for the bombing, there was no error, when the attorney appeared to testify almost six months after the bombing, in a refusal to have the jury

polled to determine whether they had a memory of the bombing from news accounts. [389–390]

Reference by the judge in his charge at the trial of indictments to certain testimony as being the testimony of a named witness, whereas it was the testimony of another witness, was harmless where no exception was saved by any defendant and apparently counsel were not confused. [390–391]

At the trial of indictments for being an accessory before the fact to murder and for conspiracy to murder the victim and for conspiracy to murder a companion of the victim, testimony of the central figure of such conspiracies, and of a second witness indicating consciousness of guilt on the part of the defendant, warranted an inference that the defendant adhered to both enterprises to kill and furthered them by encouraging, and perhaps ordering, the first witness to go forward with them, and warranted a conclusion that the defendant was guilty upon all indictments. [391–392]

At the trial of indictments for being an accessory before the fact to murder and for conspiracy to murder the victim and for conspiracy to murder a companion of the victim, testimony of a conspirator warranted findings that the defendant initiated the plan and paid for the murder and was guilty upon all indictments. [392–393]

Evidence warranted findings that a defendant indicted for being an accessory before the fact to murder and for conspiracy to murder the victim and for conspiracy to murder a companion of the victim participated in both plans to kill, received pay for his work in connection therewith, and was guilty upon all indictments. [393]

There was no prejudice at the trial of indictments in a comment by the prosecutor on the failure of the defendants to call a certain witness who was available to the Commonwealth as well as to the defendants, where the judge explained to the jury that the comment was justified because the defendant's attorney had said that he was going to call the witness but did not do so. [393–394]

Any prejudice from a comment by the judge, in the middle of a long trial of indictments against several defendants, that defence objections had been unduly frequent, was adequately cured in the charge. [394]

The record of a protracted trial of indictments disclosed no justification for a contention by a defendant that the cumulative effect of alleged "disparaging" and "intemperate" comments by the judge about defence counsel denied that defendant a fair trial. [395]

The charge at the trial of indictments with respect to testimony of an accomplice of the defendants was not inadequate in that the judge did not instruct that such testimony must be "received with suspicion and acted upon with great caution." [395–396]

At the trial of indictments, the judge properly did not charge that the testimony of an attorney should be viewed with caution because the witness might conceivably have been found to have been an accessory after the fact. [396]

At a joint trial of several defendants on conspiracy, murder, and accessory indictments arising from the same events, there was no abuse of

discretion on the part of the judge, when a particular defendant rested at the close of the Commonwealth's case and his motion for a directed verdict was denied, in requiring that defendant and his counsel to continue in attendance at the trial and in receiving, after stating that he would receive, evidence against that defendant brought out through the witnesses of other defendants. [396–397]

At a joint trial of several defendants convicted on capital charges, where testimony from key witnesses before the jury for long periods was credible and warranted the verdicts returned, although three of such witnesses had criminal records and incentives or motives or self-interest behind their testimony, and a fourth witness understandably might have entertained hostility toward two defendants, nothing in the record indicated any reason for this court to exercise any of its powers under G. L. c. 278, § 33E, as amended by St. 1962, c. 453. [397–398]

It was within the discretion of the judge in a criminal case to deny motions for access to police reports. [399]

The judge in a criminal case was not required to conduct a public opinion poll of the community in order to determine whether the defendant could receive a fair trial. [400]

No abuse of discretion or prejudice resulted in a criminal case involving several defendants where the judge accepted a plea of guilty by one of the defendants before the selection of a jury to try the other defendants. [400]

At a criminal trial for serious offences, there was no abuse of discretion in excusing certain veniremen on the basis of the judge's observation of their capacity and suitability intelligently to perform the duties of jurors [400]; a public school teacher was not precluded from serving as a juror although he was exempt from service [400]; and a State employee, a director of social services, was not disqualified for service as a juror by bias [400].

An attorney for a defendant in a murder case was not barred by the attorney-client privilege from testifying that he observed blood on the clothing and shoe of that defendant at a police station shortly after the commission of the murder. [402]

At a criminal trial of several defendants in which the testimony of a certain witness was admissible only against one defendant whose counsel had cross-examined the witness, there was no error in refusing to allow counsel for another defendant to cross-examine him. [402]

There was no error at a criminal trial in a remark by the judge to the jury that "everything" that he "rule[d] on" was subject to review by the Supreme Judicial Court where he made it plain to the jury that their decision on the facts and credibility was final and not subject to review. [404]

There was no abuse of discretion where the judge at a criminal trial refused to suspend the trial at the usual afternoon hour therefor in order to complete the cross-examination of a witness that afternoon. [404–405]

No error appeared at a criminal trial in the judge's reading to the jury

the passage from *Commonwealth* v. *Webster*, 5 Cush. 295, 319, respecting alibi testimony where he adequately charged the jury as to the Commonwealth's burden of proving guilt beyond a reasonable doubt. [405]

There was no error at a criminal trial in the judge's charge as to the jury's endeavoring to reach a unanimous verdict "without prejudicing . . . their own conscience[s]." [405]

There was no error at a criminal trial in certain language in the charge relative to conspiracy and the meaning of the term accessory before the fact. [405–406]

SEVEN INDICTMENTS found and returned in the Superior Court on October 25, 1967.

Pretrial motions were heard by *Forte, J.,* and the cases were tried before him.

*Joseph J. Balliro* for the defendant Tameleo.

*Manuel Katz* for the defendant French.

*Ronald J. Chisholm* for the defendant Cassesso.

*Albert L. Hutton, Jr. (John B. Greene* with him) for the defendant Grieco.

*Chester C. Paris* for the defendant Salvati.

*David Berman* for the defendant Limone.

*Jack I. Zalkind,* Assistant District Attorney *(James M. McDonough,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

CUTTER, J.    French and Grieco were indicted on October 25, 1967, for the murder of Edward Deegan on March 12, 1965.    Tameleo, Limone, Cassesso, and Salvati were separately indicted as accessories before the fact.    All these defendants, together with Joseph Baron (born Barboza), were charged in one indictment with conspiracy to murder Deegan, and in another indictment with conspiracy to murder Anthony J. Stathopoulos.

French was found guilty of murder in the first degree and Salvati was found guilty of being an accessory, each with a recommendation that the death penalty not be imposed. Grieco was found guilty of murder in the first degree, and Cassesso, Tameleo and Limone were found guilty as accessories.    These four defendants were sentenced to death. Each defendant was found guilty on the two conspiracy

indictments.   Baron entered a plea of guilty to the two conspiracy indictments on the opening day of the trial.[2] The other defendants appealed.   The cases were tried under G. L. c. 278, §§ 33A-33G, as amended.

## SUMMARY OF EVIDENCE.

On the evidence the jury could have found the following facts: Deegan's body was discovered in an alley in Chelsea about 11 P.M. on March 12, 1965.   There were six gunshot wounds in the body.   At least three different weapons had been used.

About 9:30 P.M. on that evening, Stathopoulos stopped an automobile on Fourth Street, Chelsea, opposite the entrance to the alley.   With him were French and Deegan.[3]   These two entered the alley.   A few seconds after they disappeared, Stathopoulos "heard a volley of shots."   French reappeared and was joined by a "quite heavy" man with a gun in his hand who looked like Grieco.   Stathopoulos had not seen the man before.   He heard a voice say, "Get him too."   He "took off."

Baron's testimony was of major importance.   His direct examination consumed two days and his cross-examination nearly six and one-half days.   He had a long criminal record. Baron had known Grieco since 1961, and French and Limone since 1961 or 1962.   He met Cassesso and Tameleo in 1964 and Salvati in February, 1965.

Baron, then a "loan shark," saw Limone about January 20, 1965, near an old store, known as the "dog

---

[2] The trial commenced on May 27, 1968.   Numerous motions had been heard prior to that date.   The trial judge examined 1,183 veniremen.   A jury of sixteen persons was completed on June 26, the twenty-second day of trial, in proceedings recorded on 2,749 transcript pages.   The trial continued until July 31, 1968, a total of fifty days.   The stenographic record occupies 7,555 pages (exclusive of 614 pages of pre-trial hearings).   There are 4,806 pages of transcript of proceedings after the last juror was sworn.   The defendants saved 792 exceptions at trial and made 469 assignments of error.

[3] The purported purpose of the trip was a breaking and entering, and theft in a building abutting on the alley.   By prearrangement, a door was to be left open to the premises of Beneficial Finance Company.   Stathopoulos and Deegan discussed the plan with French at a Saugus bowling alley.   French admitted his participation in the plan during his testimony.

house," on Prince Street, Boston. Baron gave Limone weekly interest on illegal loans owed by Baron to Limone. Limone asked to talk to Baron about "something important." They went to an office used by Limone. There, Limone (B-1)[4] offered him a "contract" to kill Deegan for $7,500, which Limone said had been approved by the "office" and that Tameleo knew of it. Baron explained (without objection) that the "office" was what "people termed as the Cosa Nostra."

Limone gave reasons for offering the "contract." (1) Deegan had participated in a theft from one Puopolo's house. Harold Hannah and William Delaney had been with him. They already had been "found floating in the water" dead.[5] (2) Deegan and Stathopoulos had been involved in the death (on October 17, 1964) of one Sacramone and "the office" was going to do something about it; and (3) Deegan had caused trouble, at the Ebb Tide Restaurant in Revere (see fn. 6), and had caused annoyance to Limone. Baron told Limone that he wanted to speak to Tameleo about the proposal.

Baron spoke to Tameleo (B-2, see fn. 4) at the Ebb Tide Restaurant about two days later. He told Tameleo that Limone "offered me a contract on . . . Deegan" and also "that the office okayed it." Tameleo said, "Yes, that's right." Baron said that, even though Limone "said it was

---

[4] This conversation originally was admitted solely against Limone. The judge instructed the jury to this effect. The letters B-1, B-2, etc. refer to the particular conversation (in which Baron participated) for ease in referring to them later in this opinion.

[5] In testimony witnesses mentioned the deaths of various persons connected in 1964 to 1966 with Deegan or with one or more of the defendants. These included Sacramone, died October 17, 1964; Hannah and Delaney, referred to above; Deegan, killed March 12, 1965; Romeo Martin, died July 9, 1965; Arthur Bratsos and Thomas DePrisco, friends or "partners" of Baron, referred to in Mr. John Fitzgerald's testimony, died November 15, 1966; and Chico Amico (killed December 7, 1966). The trial judge took pains to prevent the jury from learning, through introduction of the appropriate death certificates (see G. L. c. 46, § 19, as amended through St. 1950, c. 366; see later amendment by St. 1969, c. 478), that Amico, Bratsos, DePrisco, and Martin were homicide victims, although to some extent these facts appeared in cross-examination. Counsel for Tameleo, Grieco, French, and Salvati have brought to our attention (by appendices to their consolidated brief) that Mr. Fitzgerald, then counsel for Baron, lost a leg on January 30, 1968, when a bomb attached to the ignition of his automobile exploded.

all right . . . I want you to okay it . . . if you don't okay it, I won't do it." Tameleo said, "He definitely goes. . . . No punk like Deegan is going to push the office around and cause trouble inside the Ebb Tide."[6] Reference was made to Deegan as "involved in a $82,000 burglary in . . . Puopolo's" house.

Early in February, 1965, Baron spoke to Grieco and Tameleo, and by telephone with Cassesso, then in Florida. Baron went to Florida. There he told Cassesso (B-3) that he had a "contract" for $7,500. Before leaving Florida, he told Cassesso (B-4) that he would "try to cut him in on the contract."

Baron also saw Grieco in Florida. He (B-5) told Grieco, "I am trying to grab Deegan . . . and I can't . . . set him up." Grieco replied that "Deegan stole with . . . French." Baron offered Grieco "a piece of the action" if he would speak to French.

Later Baron in Boston spoke (B-6) with Limone about "the Deegan matter." While driving to Providence with Cassesso, Baron told (B-7) him "that the Deegan contract was an office matter and that . . . Limone was the one that offered it" to Baron "and that it was okayed." Baron told Cassesso "why the office wanted . . . Deegan wiped out."

About March 7, Baron arranged (B-8) for Grieco to see French at the Ebb Tide Restaurant where French was "a bouncer." Later Baron joined them and they discussed (B-9) the Deegan situation. French said, "I steal with Deegan, but I am not a friend of his." He undertook to help "to arrange this."

On March 11, French reported to Baron (B-10) "that there was a strong possibility of Deegan, Stathopoulos, and himself robbing a finance company in Chelsea" and that "it looked . . . as if Deegan and French were going to go in the alley and Stathopoulos was going to wait outside." Baron (because he did not want Limone to know the

---

[6] Baron was told by Tameleo that the "office walked in ['for nothing'] for 20 per cent of the Ebb Tide . . . to keep down trouble." Another conversation revealed that Tameleo himself had bought out for $20,000 one Ventola's interest in the Ebb Tide.

precise date) then reported (B–11) to Limone "that it looked
like within a few weeks" he could straighten out the matter
but that "Stathopoulos would be involved." Limone said
that he would "add . . . $2,500 if Stathopoulos was taken
out of the picture." Baron inquired whether Tameleo knew
about this. Limone replied that "the office knows about"
it and that, "if they could get the two of them, it wouldn't
make no difference."

Baron then went to Cassesso's apartment on Fleet Street.
There he found Cassesso and Romeo Martin, an ex-convict.
There had been a previous talk with Martin, in Cassesso's
presence, about bringing Martin in on the "contract."
Baron told (B–12) the others that he had "a contract on —
Deegan" and "it looks like it's set for tomorrow." He also
said that "French was . . . setting Deegan up." They
were then joined by Chico Amico, then Baron's "partner."
At the time of trial Martin and Amico were both dead (see
fn. 5). Later Baron saw Grieco and told him (B–13) that
Cassesso, Amico, Martin, and he (Baron) were involved "in
regards to the contract itself" and that he (Baron) had
"seen" Limone. Grieco said that he "didn't want the
office to know" that he was involved but that the other
participants were "all right with him."

Grieco and Baron then returned to Cassesso's apartment
and (with Cassesso, Martin, and Amico) they discussed
(B–14) the project of killing both Deegan and Stathopoulos.
Grieco and Martin were to be in the alley before French and
Deegan arrived. After Deegan was shot, Baron and Cassesso
would "go to Stathopoulos' car." Amico, in a car not stolen,
would endeavor to "stall" his car and delay any police in
the neighborhood. At this discussion, it was suggested that
Salvati be brought into the project.

Baron spoke (B–15) to Tameleo at the Ebb Tide. Baron
reported to Tameleo that Limone had said "it would be all
right to whack out Stathopoulos and . . . he was sure the
office would okay it." Tameleo replied, "[H]e has . . . as
many sins as Deegan has and he goes too." Baron testified
that, if Tameleo had not given this approval and the earlier

approval of killing Deegan, he (Baron) would have done nothing further about killing Deegan and Stathopoulos.

About 2 P.M. on March 12, 1965, French who had just left Stathopoulos and Deegan reported (B–16) to Baron "French and Deegan would go in the alley and . . . Stathopoulos would stay . . . in the car." The project was set for 9 P.M.

Baron then went to the Fleet Street apartment. Grieco, Cassesso, Martin, Amico, and Baron discussed (B–17) the arrangements. Baron said that Salvati "would have to be involved." Cassesso produced Salvati, talked with him privately, and then reported, "Joe's included." Weapons and items of disguise were discussed.

At some point, it was agreed (B–18) that the murder fee be divided among Baron, Cassesso, Grieco, Martin ($1,500 each) Salvati and Amico ($750). No provision was made for French. Baron regarded his participation as "an act of friendship" to Grieco. The fee for killing Stathopoulos was to be divided in the same proportions.

About 7 P.M. Baron, Cassesso, Salvati, Martin and Amico met at the Fleet Street apartment. Salvati distributed silk gloves and, from a weapons stockpile kept by Cassesso, issued .357 magnums to Baron and Cassesso. Martin, who had his own .38, was given a .45 for Grieco. Baron later gave Salvati his own .38. For disguises, Baron and Cassesso each "had phony glasses and a moustache," Salvati "had glasses and a moustache and a wig that made him look bald (see fn. 7)," and Amico had a moustache. Martin had no disguise. Amico had no gun.

Cassesso, Martin, and Baron went to Fourth Street, Chelsea, and stopped. They attracted some attention, so moved on to the Ebb Tide Restaurant. Baron went inside and talked (B–19) with French.

About 9 P.M. Cassesso, Martin, and Baron left the restaurant. Amico in his automobile was told to follow the others. With Baron driving, Cassesso in front, and Salvati in the rear, these three went to a point around the corner from the alley. Grieco and Martin parked near them.

Salvati remained in the automobile. Cassesso and Baron got out. Baron waited at the corner of Fourth and Pearl Streets. Grieco and Martin entered the alley.

Baron headed back to the automobile. Cassesso "curled the back plate" and Baron bent the front plate. They then drove around several blocks and parked on Fourth Street. Salvati was to take the wheel and pull up in front of Stathopoulos' automobile "to box him in." They, however, saw a man on a corner nearby, who started toward them and looked at the bent number plates. It seemed to them as if he were "reaching for a gun" and might be the "law."[7] Baron "pulled out fast" with Cassesso still at his side. En route to the Ebb Tide Restaurant, Baron let Cassesso get out to warn Amico, Baron took off a bullet-proof vest, and with Salvati, he unbent the license plates.

At the restaurant Baron looked for French. After about half an hour, he saw French alone (B–20) briefly. French took Baron to a back room where Cassesso, Martin, Amico, and Salvati (but not Grieco) were present. French told (B–21) them that, as he and Deegan were going into the alley, "he thought Deegan . . . was starting to get suspicious." He said "he . . . shot Deegan in the back of the head." "[U]pon leaving the alley" French "was shocked to see . . . [Stathopoulos] still out there."

French had "reddish" stains on his sleeve and right shoe He explained, "When I shot . . . [Deegan] the blood went all over my arm." Martin told the group that he was inside the doorway when he "heard a shot." He "opened the door, and Deegan was just going to his knees." Grieco "was already over him," and "was firing into . . . [Deegan's] chest." French said that he had "got rid of the gun" (a .38). Cassesso said that he had seen the Stathopoulos car go by him.

On March 13, Baron was told (B–22) by Cassesso that

---

[7] There was later testimony from a Chelsea police captain that he had observed an automobile with bent plates on Fourth Street on the evening of March 12. There were two men in the front seat and a man in the back seat who had a bald spot. See Baron's testimony about Salvati's wig, described above. The automobile sped away.

French had been questioned the night before. Baron then saw Limone near the "dog house." Limone said (B–23) that Deegan "won't bother me . . . anybody any more." Baron told Limone that he and Cassesso had killed Deegan and that "French set him up," but that Stathopoulos had escaped. Limone left Baron for a few minutes and came back with packets of money.

Baron returned to Cassesso's apartment. Cassesso, Salvati, Amico and Martin were there. They counted the money and Baron distributed the shares of those present.

Baron later found Grieco on Brooks Street, East Boston, in his automobile. Baron gave him his agreed share of the money. Grieco had asked (B–24) for prompt payment the day before. Grieco said (B–25) that he was surprised "when French shot Deegan" and that he then "started shooting Deegan in the chest," and Martin "fired after him." Grieco "said he was going to use the alibi . . . that he never left Florida." Later on the thirteenth, Baron saw French who (B–26) "said that he got questioned last night and . . . they saw blood on his arm." He explained "about a guy had a bloodied nose that bled all over him."

Stathopoulos, after he drove away from the alley, went with a friend to the house of an Everett attorney, Mr. Alfred Farese. These three went to the Chelsea police station and later to the alley. Stathopoulos (later in March, 1965) had talks with Mr. Farese and Mr. John Fitzgerald, an attorney associated with Mr. Farese. In September, 1967, he spoke with the district attorney of Suffolk County. Other testimony by Stathopoulos is discussed later in this opinion.

Robert Glavin, who had been serving a sentence for first degree murder, testified that while at Norfolk prison colony one Ventola approached him, on behalf of Cassesso, about making a false confession to the murder of Deegan. He also talked with Cassesso. These conversations are discussed later in this opinion.

Mr. Fitzgerald (released by Baron and Stathopoulos from the attorney-client privilege) testified that he had known Grieco, French, and Deegan since 1964. He had seen

French and Grieco together. He also knew Tameleo, and
Limone. He had known Stathopoulos before March 12,
1965. From about 1:30 A.M. to about 5:30 A.M. on March 13,
Mr. Fitzgerald saw French (as his lawyer) at the Chelsea
police station. He observed blood spots on French's sleeve
and on his shoe. He went to the police station with Stathop-
oulos on March 15 or 16, 1965.

On May 21, 1967, Mr. Fitzgerald met Grieco. As a con-
sequence, between July 11 and 15, 1967, he met Tameleo
and Grieco. He had not been attorney for either defendant.[8]

Tameleo asked what Mr. Fitzgerald knew about the
Deegan affair. Mr. Fitzgerald told him that Stathopoulos
had been with Deegan and French at the time Deegan was
killed and that subsequent attempts had been made to kill
Stathopoulos. To this, Grieco said, "We can't afford to
have anybody playing around with that kid," and also, "I
will have to speak to some people about it."

Tameleo asked why Baron was coöperating with the
authorities. Mr. Fitzgerald told him that Baron thought
two friends (Bratsos and DePrisco, see fn. 5) had been
killed by "the combination," that attempts had been made
to kill his brother, his wife, and his child, and that "they"
had taken over Baron's "shylocking business." Grieco
said that he knew how to straighten out Baron (by giving
him "bread," i.e. money). Tameleo said that Grieco "was
his man and that any future deals" should "be made
through . . . Grieco."

Mr. Fitzgerald spoke with Grieco and Mr. Farese (prob-
ably about August 6, 1967).[9] Mr. Farese said that "they"

[8] This conversation was offered not only against Tameleo and Grieco,
but originally against the others, on the ground that a conspiracy to kill
Stathopoulos continued until the time of the conversation. On the next day
of trial, the judge (after examining the evidence relating to the termination of
the conspiracy) instructed the jury that the testimony given up to that point
by Mr. Fitzgerald was to "be considered . . . only as against . . . Tameleo
and . . . Grieco."

[9] This conversation was admitted against (1) Grieco, who was present; and
(2) Tameleo, because "his man," Grieco, was present; and (3) against the
others because a conspiracy to kill Stathopoulos could be found to be still
continuing. The following day the judge (see fn. 8) modified his ruling and
instructed the jury that the evidence was to be admitted only against Tameleo
and Grieco.

were willing to pay Baron $25,000 not to testify in the
Deegan case. It was proposed that Grieco "straighten
. . . out," or even "whack out," Arthur Pearson (the victim
of a stabbing for which Baron had been indicted) and that
one Fabiano "take the beef on" another such indictment.
On the next day, Mr. Fitzgerald talked with an F.B.I.
agent and then with Baron. Mr. Fitzgerald thereafter told
Grieco that Baron said $25,000 was not enough and he
wanted $50,000. Grieco later reported, "We will give him
$50,000 . . . not [to] testify in the Deegan case." Mr.
Fitzgerald saw Baron the next day, and then told Grieco
that Baron was going to coöperate with prosecuting offi-
cials.

French, in his testimony, admitted being in the alley with
Deegan and that he had gone with Deegan and Stathopoulos
to the area. He had heard five to seven shots, and left the
alley. He denied having any gun with him. He had known
Grieco since 1945 but did not see him in 1965 because Grieco
was in Florida. Other defendants' testimony, which the
jury were not required to believe, is summarized in the
margin.[10]

Other aspects of the evidence are discussed in connection
with the assignments of error. We discuss in the body of the
opinion those assignments which appear to present the most
substantial issues. In the Appendix, there is brief discussion
of many other issues.

---

[10] Tameleo and Cassesso did not testify. Limone testified that he had
been friendly with Deegan; that he had no alibi for March 12, and 13, 1965,
that he first met Baron at the end of February, 1965; that he had seen
Stathopoulos with Deegan in a veterans' club; and that he had known Grieco
only from late 1965. French he met in the Charles Street jail. He had known
Cassesso and Salvati for ten to twelve years and Tameleo for four or five
years. Grieco testified that he was in Florida from February 24, 1965, to the
end of April, that he never was in an apartment on Fleet Street with Baron
or in the vicinity, and that he had no part in killing Deegan. Salvati testified
that he did not know where he was on March 12, 1965. He admitted that he
had been in the Fleet Street apartment, but only once when Baron and Cassesso
also were there and Baron stabbed one Civetti. Salvati also testified that he
did not know Grieco, that he had known Limone casually for ten years, and
that he had not known Tameleo or Baron prior to March 12, 1965.

## REQUESTS FOR SEVERANCE OF TRIALS.

1. During the trial,[11] motions to sever (the cases against the six defendants) were made on various grounds. We consider first those which relate to *Bruton* v. *United States,* 391 U. S. 123 (decided May 20, 1968, one week before this trial commenced). See *Roberts* v. *Russell,* 392 U. S. 293, 294.

In the *Bruton* case (see p. 124) one Evans and Bruton were tried together for armed postal robbery. A postal inspector obtained an oral confession from Evans, which (see p. 124, fn. 1) led to a later confession by Evans which implicated Bruton. The confession was admitted against Evans, but (p. 125) the judge instructed that it was inadmissible against Bruton. The Court of Appeals (1) reversed Evans' conviction because no warnings had been given to Evans and the confession (pp. 125–126) thus had been wrongly admitted against him, but (2) allowed Bruton's conviction to stand because the confession had not been admitted against him. The Supreme Court (with two dissents, pp. 138–144) reversed because (p. 126 et seq.) "of the substantial risk that the jury, despite instructions . . . looked to the incriminating extra judicial statements in determining . . . [Bruton's] guilt." The majority held that "admission of Evans' confession in this joint trial violated . . . [Bruton's] right of cross-examination secured by . . . the Sixth Amendment." We, of course, are compelled to follow the *Bruton* case, if it applies to the facts before us. See *Commonwealth* v. *Carita,* 356 Mass. 132, 137–140.

There are differences between the *Bruton* decision and the present case. (1) The *Bruton* case dealt with a post-arrest confession by a codefendant to an investigating official. In the present case, no defendant (other than Baron) has confessed.[12] (2) Four defendants (Limone, French, Grieco, and

---

[11] Motions to sever made prior to trial were denied. Action upon these pre-trial motions was a matter within the presiding judge's discretion. No abuse of discretion has been shown. *Commonwealth* v. *Fancy,* 349 Mass. 196, 204. See *Commonwealth* v. *Scott,* 355 Mass. 471, 476–478.

[12] Our cases have viewed admissions as different from confessions. See *Commonwealth* v. *Bingham,* 158 Mass. 169, 171; *Commonwealth* v. *Seeley,* 167 Mass. 163, 165; *Commonwealth* v. *Sacco,* 255 Mass. 369, 413.

Salvati) took the stand and were available for cross-examination.[13] (3) There are conspiracy charges, as well as substantive murder charges, against each defendant. Principles (constituting well recognized exceptions to the hearsay rule) governing the admissibility of evidence of statements of coconspirators, to prove conspiracy and common criminal enterprises, are thus applicable.[14] These have not been treated as altered by the *Bruton* case. See *Parness* v. *United States*, 415 F. 2d 346, 347 (3d Cir.); *Campbell* v. *United States*, 415 F. 2d 356 (6th Cir.). (4) certain out-of-court statements, discussed below, were received in evidence. These, for the most part, originally were admitted only against the defendants to whom they were attributed (and others present when they were made). They do not appear very directly or clearly to charge defendants (not present when the statements were made) with complicity in Deegan's murder. In this they were not like Evans' confession "expressly implicating" Bruton (391 U. S. 123, 124, fn. 1).

We examine in detail the principal out-of-court statements which the defendants suggest may present an issue under the *Bruton* case.

(a) Baron testified to four conversations with Limone or Tameleo. (i) Baron's first talk (about January 20, 1965) with Limone (B–1, see fn. 4) about the "contract" when Baron asked Limone if Tameleo knew about the offer, and Limone "said yes"; (ii) Baron's report (B–2) to Tameleo, about the "contract" offer (and Limone's statement "that

---

[13] It does not appear that any defendant in fact cross-examined any other defendant who took the stand. At the conclusion of the testimony of Limone (the first defendant to testify), the trial judge inquired whether the defendants had questions. Three attorneys indicated that they had no questions. Cassesso's attorney purported to reserve cross-examination until after the assistant district attorney's cross-examination. He then asked no questions. No similar inquiry was made by the judge after other defendants testified on direct examination. No specific request, however, was made by any defendant for the privilege of making inquiry of any defendant who took the stand.

[14] See *Commonwealth* v. *Riches*, 219 Mass. 433, 438; *Commonwealth* v. *Benesch*, 290 Mass. 125, 132–133; *Commonwealth* v. *David*, 335 Mass. 686, 694; *Commonwealth* v. *Binkiewicz*, 342 Mass. 740, 758; *Commonwealth* v. *Kiernan*, 348 Mass. 29, 56, cert. den. sub nom. *Gordon* v. *Massachusetts*, 380 U. S. 913; *Commonwealth* v. *Stasiun*, 349 Mass. 38, 51; *Commonwealth* v. *Monahan*, 349 Mass. 139, 153–154; *Commonwealth* v. *Hamblen*, 352 Mass. 438, 443–444. See fn. 27, *infra*.

the office okayed it"), and Tameleo's reply "Yes, that's right"; (iii) Limone's offer (B–11) to Baron to have "Stathopoulos . . . taken out of the picture," and his statement that the "office knows about" it or "will know about this"; and (iv) Baron's later report to Tameleo (B–15) that Limone had said that "it would be all right to whack out Stathopoulos," and Tameleo's reply, "[H]e goes too." The statements attributed to one only incidentally tended to implicate the other, principally by indicating that each had knowledge of the other's words and actions. We do not view the *Bruton* case as preventing introduction, in a joint trial, of out-of-court admissions by one defendant which only incidentally and indirectly reflect adversely on another defendant. These conversations do not require severance.[15]

(b) Baron's talks (February, 1965) with Cassesso (B–3, B–4) and Grieco (B–5) in Florida and his talk (B–7) with Cassesso when en route to Providence added nothing to earlier testimony about the offer of the "contract" and the "office" approval of it. It made no charge (concerning the Deegan murder or the effort to kill Stathopoulos) against defendants other than Cassesso, if indeed it made any charge against him.[16]

(c) Stathopoulos testified that Baron told him in September, 1967, that Baron "was the one to shoot" Stathopoulos; that the "office" wanted him "knocked off," and that Baron had tried to poison him at Deer Island. There were other references to the "office" in out-of-court statements

---

[15] It is also argued that Baron's testimony concerning these statements by Tameleo and Limone implicated other defendants under the conspiracy indictments. Separate testimony of Baron linked each other defendant with each conspiracy. Cf. *Commonwealth* v. *Stasiun*, 349 Mass. 38, 47–48, 50–53. As to the conspiracy indictments, Baron's conversations with Tameleo and Limone merely tended to prove that they had joined the conspiracies. It "is not necessary that all the conspirators join in every part of the unlawful transaction" and "the knowledge possessed by each [conspirator] of the scope . . . of the affair may be widely at variance." See *Commonwealth* v. *Beal*, 314 Mass. 210, 222–224; *Blumenthal* v. *United States*, 332 U. S. 539, 556–557.

[16] No charge, directly relating to Deegan's murder, was implied in Baron's quotation of Cassesso during this trip as accusing Limone of having in earlier days, "ratted on some guys," and Tameleo of having "told the law about a . . . stick-up where two guys got killed."

testified to by Baron and other witnesses.[17]   Tameleo contends that these statements must be taken as referring to him.

The jury could infer that Baron regarded Tameleo as having some authority (not well defined) to speak for the "office" (at least with respect to killing Deegan and Stathopoulos), and Limone as having even less authority.   The evidence does not show what the organization was, who belonged to it, or how it was organized.   Baron admitted that, by claiming credit for the Deegan murder, he wanted to "elevate" himself with the organization.   The witnesses who mentioned it seemed to regard it apparently with apprehension (see fn. 5), as a group of substantial size and of unspecified membership and activities.   Tameleo was quoted by Baron (see fn. 6) as saying that the "office" had "walked in" on the operation of the Ebb Tide.   From this it might be inferred that even Tameleo regarded the "office" as being something other than himself.[18]   The vague, indefinite references to the interest of the "office" in the Deegan situation did not amount, we conclude, to any identifiable charge against any other defendant.

(d) We perceive no charge against defendants other than Tameleo and Grieco in Mr. Fitzgerald's accounts of his talks with one or both of them about efforts to keep Baron from testifying.   Mr. Fitzgerald's talks with Grieco (when Tameleo was not present) implicated Tameleo, but he had recently designated Grieco to Mr. Fitzgerald as "his man" and had said "that any future deals . . . were be to made through . . . Grieco."   Tameleo thus cannot reasonably complain of charges or admissions concerning him made in

---

[17] One statement by Glavin, referred to by some defendants in their brief, is immaterial because it was made during voir dire testimony in the absence of the jury.

[18] At pre-trial hearings on motions for admission to bail (December 4, 1967) considerable evidence was introduced concerning important connections of Tameleo and Limone with the Cosa Nostra organization, including a report of hearings in October, 1963, before the Senate Committee on Government Operations, 88th Cong. 1st Sess. part 2, see pp. 550–559, 565–568, entitled "Organized Crime and Illicit Traffic in Narcotics."   No effort, however, was made at trial to prove before the jury any defendant's membership in the Cosa Nostra.   Indeed, the trial judge took unnecessary precautions to avoid such evidence, when objection was made, in connection with the cross-examination of Glavin, discussed later in this opinion.

talks with one in effect named by him as his agent. Mr.
Fitzgerald's statements (concerning what he knew of the
activities of Deegan, Stathopoulos, and French on March 12,
1965, and of later attempts on Stathopoulos' life) implicated
no defendant except French, who, in any event, admitted
being with Stathopoulos on March 12 just before Deegan
was killed.

The language of the *Bruton* case is general. We recog-
nize that hereafter it may be applied more broadly than was
required by the precise facts then before the Supreme Court.
Weighed in the context of a long trial, we think that the
out-of-court statements, relied on as requiring severance
under the *Bruton* decision, do not contain sufficiently
definite charges against other defendants to require the
judge to grant severance.[19]

2. The defendants contend that the conspiracy indict-
ments should have been tried separately from the capital
cases because of G. L. c. 278, § 2A, inserted by St. 1968,
c. 721, § 2.[20] Chapter 721, approved July 19, 1968, does not

---

[19] These cases were tried almost immediately after the *Bruton* decision. The
scope of that decision still remains uncertain two years later. See e.g. *Caton* v.
*United States,* 407 F. 2d 367, 372–373 (8th Cir.), cert. den. 395 U. S. 984;
*Jordan* v. *United States,* 416 F. 2d 338, 344 (9th Cir.); *James* v. *United States,*
416 F. 2d 467, 474–475 (5th Cir.); *Posey* v. *United States,* 416 F. 2d 545,
550–551 (5th Cir.); *Williams* v. *United States,* 416 F. 2d 1064, 1070 (8th Cir.);
*Roberts* v. *United States,* 416 F. 2d 1216, 1224 (5th Cir.). See also *Common-
wealth* v. *Scott,* 355 Mass. 471, 477–478; *United States ex rel.* v. *Pate, Warden,*
418 F. 2d 1028, 1030–1031 (7th Cir.).

[20] Section 2A reads, "An indictment for conspiracy to commit a substantive
offence shall not be tried simultaneously with an indictment for the commission
of said substantive offence." The Governor (1968 House Doc. No. 3797, p. 2,
and Appendix C, pp. 21–22), on February 6, 1968, recommended legislation
giving greatly increased penalties for conspiracy. He did not recommend
what is now § 2A. On June 27, 1968, the House Committee on the Judiciary
reported only 1968 House Bill No. 4771, a somewhat longer version of what is
now § 2A. See 1968 House Journal, p. 2165. On June 28, 1968, on motion of
the Chairman of the House Committee on the Judiciary, 1968 House Bill No.
4799 was substituted. That contained the bill originally recommended by
the Governor plus what is now § 2A. See 1968 House Journal, p. 2197. A
further amendment (not here relevant) to § 1 of the bill (inserting G. L. c. 274,
§ 7) later was adopted in the Senate. See 1968 Senate Journal, p. 1681. The
legislative history affords no indication of why § 2A, which may add new
complications to enforcement of the criminal law, was adopted at all, or that
there was any provision or reason for it to become effective upon passage.
Because we hold that c. 721 has no application to the present case, there is no
occasion for us to consider its interpretation or validity. See discussion below
(part 8 of this opinion) concerning admissibility of evidence of acts and declara-
tions of participants in a common criminal enterprise.

explicitly state when it shall be effective. It was not an emergency law and thus could not have been effective earlier than August 18, 1968.[21] We see nothing in § 2A which should lead to the application of the section to a trial completed when it took effect, or to indicate that the Legislature intended any retroactive application.[22]

3. Severance was not required because of the effect of the joint trial upon the number of peremptory challenges by the Commonwealth and the defendants, respectively. *Commonwealth* v. *Millen,* 289 Mass. 441, 486–487. See *Commonwealth* v. *Geagan,* 339 Mass. 487, 502.

4. The defendants cite no controlling authority for the principle that they were entitled to a severance because of the possibility that they might wish to assert antagonistic defences or use different trial strategy.[23] *Garrity* v. *New Jersey,* 385 U. S. 493, 500, is not such authority. See *Caton* v. *United States,* 407 F. 2d 367, 372 (8th Cir.), cert. den. 395 U. S. 984. Severance for these reasons was discretionary with the trial judge.

5. Tameleo, and to some extent other defendants, contend that the conduct of other defence counsel required severance. There was an unusual amount of unseemly, abrasive colloquy, and unduly frequent interruption of testimony by

---

[21] If c. 721 should be construed as relating to the powers of the Superior Court, then it was not subject to The Referendum. See art. 48 of the Amendments to the Constitution of the Commonwealth, The Referendum, I and III. A statute not subject to The Referendum "for which a different time of taking effect is not therein expressly provided" takes effect "on the thirtieth day next after the earliest day on which it has the force of a law." See G. L. (Ter. Ed.) c. 4, § 1. Chapter 721, if not subject to The Referendum, thus took effect on August 18, 1968. Cf. *Commonwealth* v. *Sacco,* 255 Mass. 369, 410–411, where the amendatory act there discussed "provided in § 2, that it should take effect upon its passage." See *Mayor of Gloucester* v. *City Clerk of Gloucester,* 327 Mass. 460, 463–464. If c. 721 was subject to The Referendum, it took effect ninety days after its approval. See *Coyle* v. *Swanson,* 345 Mass. 126, 127 (bill not within the "excluded matters" under art. 48 of the Amendments).

[22] This trial extended from May 27 to July 31, 1968. See fn. 2.

[23] Tameleo rested at the close of the Commonwealth's case. Cassesso introduced no testimony. The other defendants offered evidence which brought out that certain defendants knew each other, and had been together on various occasions. The criminal records of defendants who took the stand were introduced to impeach their credibility. The prosecution, when Tameleo rested, gave warning that examination of defence witnesses might bring out information concerning or affecting Tameleo. See part 22 of this opinion, *infra.*

repetitive objections. At least one witness and the assistant district attorney on occasion showed understandable exasperation. Some of the numerous incidents are discussed in the Appendix (par. A-27). The trial judge did not abuse his discretion in permitting the joint trial to continue despite these clashes (and the consequent admonitions of counsel by the judge). See *Commonwealth* v. *Millen,* 289 Mass. 441, 460–462; *Commonwealth* v. *Lewis,* 346 Mass. 373, 378–379; *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 226–229.[24]

### ACCESS TO GRAND JURY MINUTES.

6. The trial judge reasonably denied the defendants access to the grand jury minutes in advance of trial. *Commonwealth* v. *Carita,* 356 Mass. 132, 140–141.

7. When Baron completed his direct testimony, the defendants renewed their request that they "be furnished the [grand jury] minutes . . . concerning the . . . subject matter of . . . [Baron's] testimony." This request was denied. Defence counsel agreed that the trial judge might examine the transcript of Baron's grand jury testimony. The judge, during a recess, found one inconsistency between the minutes and Baron's trial testimony. This he disclosed to counsel.

A similar motion for grand jury minutes was made at the close of Stathopoulos' direct examination with respect to his grand jury testimony. We are referred to no place in the record showing that the motion for the grand jury testimony was pressed after the judge had opportunity to examine that testimony. These grand jury minutes never were produced.

The grand jury minutes of Baron's testimony were sought at the close of his direct examination and before he gave most

---

[24] A trial judge properly should be slow, especially after a substantial period of trial, to permit conduct of defence or other counsel to coerce a mistrial or to lead to "manufacturing error." *Commonwealth* v. *Carita,* 356 Mass. 132, 139. It is ground for prompt disciplinary action if trial counsel engage in, or encourage, or fail to exercise reasonable efforts to prevent, conduct improperly disturbing proceedings.

of his testimony on cross-examination, largely relied on now as showing "particularized" need for the minutes.[25] Cassesso's counsel later renewed his request for these minutes during his cross-examination of Baron, but this request also preceded most of Baron's testimony on which the defendants seem to rely.[26]

The trial judge in his discretion might well have made more of Baron's grand jury testimony available for use in cross-examination, but he was not bound to do so. The matters brought out on cross-examination (fn. 26) of Baron, however, were not before the trial judge at the time of his earlier rulings concerning the grand jury minutes. On the facts then before him he was warranted in denying the requests. If later testimony changed the situation, it was the defendants' duty to renew their motions. There was no abuse of discretion.

Also, no abuse of discretion appears concerning the grand jury testimony of Stathopoulos. The defendants have not shown that they pressed for these minutes adequately, after the judge had been given them for examination, or that they suffered any prejudice from not having the material.

### EVIDENCE OF OUT-OF-COURT STATEMENTS AND RELATED MATTERS.

8. It is assigned as error that testimony was received from Baron, Stathopoulos, and Mr. Fitzgerald concerning state-

---

[25] See *Commonwealth v. Doherty*, 353 Mass. 197, 209–210; *Commonwealth v. Carita*, 356 Mass. 132, 141–142; *Commonwealth v. Gordon*, 356 Mass. 598, 602–603.

[26] Baron, during cross-examination, testified (a) that on March 29, 1967; he gave partial information about the Deegan murder to F.B.I. agents, (b) that he then was indicted in April, 1967; (c) that, although he was in custody in isolation in May, 1967, he started to talk to the district attorney's representatives in July, when "deals were being made"; (d) that he told the Deegan murder story "in pieces" and did not reveal the full story he told at trial until September 8, 1967; or before the grand jury; and (e) that he first testified before a grand jury on the Deegan murder in October, 1967. The trial judge put at the disposal of defence counsel certain grand jury testimony concerning the date when Baron had thought that he had obtained his "contract" from Limone. Baron was cross-examined about this and also extensively about the dates of his Florida trip which he had thought was at a different time until shown an airplane ticket, apparently not produced until after his grand jury testimony.

ments, made in the absence of one or more of the defendants, without limiting the evidence to the declarant and persons present.

In Massachusetts, under "a conspiracy indictment, the acts and declarations of one conspirator in pursuance of the common object are admissible against the other conspirators. . . . [B]efore the acts and declarations of one are admissible against the others," the judge must make a preliminary finding upon evidence aliunde that a conspiracy exists. *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50. By the end of Baron's direct testimony, an adequate showing of conspiracy [27] had been made, for Baron's testimony included accounts of conversations with, and admissions to him by, each defendant, which permitted a finding that the defendant was a member of conspiracies to kill Deegan and Stathopoulos. Baron was, according to his testimony, the central figure of each conspiracy. Each defendant could be found to have conspired at least with him. As a consequence, at least as early as the end of Baron's testimony, out-of-court statements of defendants were admissible, against all members of the conspiracy, if the statements were in furtherance of a still continuing conspiracy.

The trial judge, in his charge, explained his action with respect to out-of-court statements by the several defendants,

---

[27] See *Commonwealth* v. *Benesch,* 290 Mass. 125, 132–133; *Commonwealth* v. *Kiernan,* 348 Mass. 29, 57–58. See also cases collected in Toomey, Some Procedural Aspects of the Prosecution of a Conspiracy in Massachusetts. 53 Mass. L. Q. 207, 240–242. No clear determination (see fn. 14) that there was a prima facie case of conspiracy appears on the record. During Baron's direct testimony, such a determination was postponed. Counsel at one point reminded the judge in a bench conference that such a ruling had already been made "in chambers" but that it had not been "told . . . to the jury." Defence counsel successfully objected to having the judge inform the jury of his ruling during trial, although he could have done so. See *Commonwealth* v. *Rogers,* 181 Mass. 184, 191. The judge instructed in the course of trial that any conspiracy "ended . . . sometime in the end of 1965 or '66. Once the alleged conspiracy [ended], *if you believe there was a conspiracy — I'm not saying there was* — then any action of one defendant can only [b]ind him, if you believe the evidence, and is not admissible against the others" (emphasis supplied). As an alternative to the procedure described in the passage quoted from the *Stasiun* case, 349 Mass. at p. 50, such evidence from a coconspirator may be admitted with the expectation that a particular defendant will be linked to the conspiracy and subject to his motion to strike the evidence if the link is not established. See *Commonwealth* v. *Kiernan,* 348 Mass. 29, 56–58.

testified to by Baron and. others.   He said, "At first I
allowed evidence of the action of one person only against
him and not . . . against the other defendants.   Then the
second man, and the third man, the fourth man, *until I
found enough evidence to submit to you whether there was a
conspiracy or not,* and I so told the lawyers [see fn. 27],
that I found sufficient evidence *for the consideration of the
jury* of a conspiracy" (emphasis supplied).   In discussing
when a conspiracy ends, he added: "I say this because once
there is a conspiracy in existence, anything that any member
of the conspiracy does or says in furtherance of the objective
of that conspiracy binds all of them . . . .   But once the
conspiracy is over, then what one does does not bind anyone
else but himself."

Cassesso's counsel excepted "to that part of the . . .
[charge] where you said the acts and declarations of one
bind all during the conspiracy because that was left up in the
air . . . and I contend that it only applies to the conspiracy
indictment and not to the substantive charges."   This
exception was without merit.   (1) There had been no re-
quest when the evidence came in that it be so limited.   See
*Runels* v. *Lowell Sun Co.* 318 Mass. 466, 471.   (2) A more
important reason is that (emphasis supplied) "where there
is proof . . . that two or more persons are engaged *in a
common criminal enterprise,* the acts and declarations of one,
during the enterprise and in furtherance of it, affect all."
*Commonwealth* v. *Chapman,* 345 Mass. 251, 255.   See
*Commonwealth* v. *Tivnon,* 8 Gray, 375, 381; *Commonwealth* v.
*Mulrey,* 170 Mass. 103, 111; *Runels* v. *Lowell Sun Co.*
318 Mass. 466, 471–472; Wigmore, Evidence (3d. ed)
§ 1079; McCormick, Evidence, § 244, pp. 521–523; Mottla,
Proof of Cases in Mass. (2d ed.) §§ 820–825.   The evidence
permitted the jury to find that the common enterprise of
killing Deegan went (on the part of each defendant) beyond
mere conspiracy.

During Baron's testimony prior to the time when a finding
of conspiracy or common enterprise would have been war-
ranted, the trial judge limited the admissibility of certain

statements by Baron concerning his conversations with
particular defendants to those defendants (and other persons
present at the respective conversations). As to the first
conversation (that with Limone at his office near the "dog
house," B–1) the judge gave ample limiting instructions and
some explanation of the reasons for them. Similar instruc-
tions were given concerning Baron's first talk (B–2) with
Tameleo at the Ebb Tide Restaurant. Short limiting in-
structions were given with respect to the defendants men-
tioned in Baron's talks, designated B–3, B–12, B–13, B–19,
B–22, B–24. There appears to have been no possible viola-
tion of the hearsay rule in the light of the limiting instruc-
tions. Adequate limiting instructions were also given
concerning two photographs, a talk with Tameleo, Cassesso,
and Amico a few days after Deegan was killed, a talk with
French and Mr. Farese on March 12 or 13, and a later talk
with Cassesso in Providence.

As to some of Baron's conversations, no limiting instruc-
tions were given. Some seem completely harmless.[28] Con-
cerning others no adequate exception was saved in behalf of
any absent defendant.[29] Exceptions were saved concerning
other out-of-court statements, but no request was made at
the time for limiting instructions.[30] See *Commonwealth* v.
*Giacomazza*, 311 Mass. 456, 468; *Commonwealth* v. *Eppich*,
342 Mass. 487, 493–494. See *Solomon* v. *Dabrowski*, 295
Mass. 358, 359–360. Eventually, of course, the state of the
testimony permitted the trial judge to admit against each
of the defendants the statements of any defendant in fur-

[28] Such conversations, barely referred to in the joint brief for Tameleo,
Grieco, French and Salvati, include (see fn. 4) part of conversation B–5 (the
first of two talks with Grieco in Florida); and conversation B–8 (talk with
Grieco, objections only to comments of judge on interruptions).

[29] These conversations include (fn. 4) part of B–5 (the second of two talks
with Grieco in Florida); B–7 (objection only by Cassesso); B–14 (planning
conference at Cassesso's apartment; exception by Cassesso only); B–16
(one talk with French on March 12; no objection when first described, but an
objection for Cassesso when later questions asked about this conference); B–17
(conference at Cassesso's apartment); B–18 (same); B–21 (back room con-
ference, Ebb Tide).

[30] Such conversations included B–9 (Grieco and French at Ebb Tide); B–10
(French); B–11 (Limone outside the "doghouse"); the second reference to
B–17 (French); B–23 (Limone, March 13, 1965).

therance of (and during) the conspiracy or common enterprise. We conclude that no prejudice resulted from any failure of the trial judge to limit the applicability of any such testimony given before a finding of conspiracy or common criminal enterprise would have been warranted.

9. During direct examination, Baron was asked (B–2, B–15) whether he would have proceeded with the plans concerning Deegan and Stathopoulos, if Tameleo had not authorized him to do so. Baron, subject to exception, answered in the negative. Baron had already given Tameleo notice (B–2) that, "if you don't okay it, I won't do it." The question concerning Tameleo's "okay" of killing Stathopoulos referred to "this Deegan matter." The answers thus did not relate to any state of mind of Baron not communicated to Tameleo. They also were in part cumulative explanation of Baron's request for approval. Even if the jury should have been left to infer Baron's intentions (not directly in issue) from what he actually said, the answers added little. Any error was harmless. See *Commonwealth* v. *Burke,* 344 Mass. 243, 248; Wigmore, Evidence (3d ed.) §§ 581, 1963; Mottla, Proof of Cases in Mass. (2d ed.) § 1201.

10. Stathopoulos testified to out-of-court statements by defendants and others, including some by Baron after the conspiracy had ended.

(a) Stathopoulos told about talks on March 12, 1965, with Deegan and one Moore about plans for their proposed break. No defendant was present. The judge erroneously admitted this testimony as res gestae. See *Rocco* v. *Boston Leader, Inc.* 340 Mass. 195, 196. See also *Commonwealth* v. *Hampton,* 351 Mass. 447, 449–450; Anderson, Wharton's Criminal Evidence (12th ed.), §§ 279–282. The talks about plans were in large part consistent with French's later testimony (about the actual events of March 12, 1965, as carried out) in which he admitted that he was at the alley. Conversations with Deegan when French was present were reasonably related to and in furtherance of the alleged common criminal enterprise. There was no prejudice.

(b) Stathopoulos testified that, about September 8, 1967, at his own request he had talked to Baron at the Barnstable County jail in the presence of two F.B.I. agents and others. Baron then told Stathopoulos that he had planned to kill him, that "it was the office that wanted . . . [Stathopoulos] knocked off," and that it was he [Baron] who had tried to have Stathopoulos poisoned. Stathopoulos also testified that, at Charles Street jail, Baron had told him that if he held "any animosity toward . . . French . . . other people will have to take action." These conversations were after the conspiracy had ended.

Baron had been cross-examined about the attempt to poison Stathopoulos, about his conversation at Barnstable with Stathopoulos, and about his motives for testifying. There had been some suggestion in the cross-examination that Baron's testimony might have been influenced by his brief talk with Stathopoulos. The trial judge acted within his discretion in permitting Stathopoulos to tell about the Barnstable talk, to explain the nature and brevity of the meeting, and to contest any suggestion of contrivance more recent than the date of the talk in September, 1967. See *Commonwealth* v. *Tucker,* 189 Mass. 457, 479–485; *Commonwealth* v. *Retkovitz,* 222 Mass. 245, 249–250; *Commonwealth* v. *Williams,* 244 Mass. 515, 520; *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 469–470. The talk with Baron at Charles Street jail was largely irrelevant. There was no prejudice in either conversation.

Later Cassesso called as his own witness Detective John F. Doyle of the district attorney's office. He had been present at the Barnstable conversation and at an earlier talk on the same day with Stathopoulos alone, in which Stathopoulos had given information in some respects perhaps inconsistent with his later testimony. Detective Doyle, on direct examination, testified that Stathopoulos, after he talked to Baron, "expanded on his original statement" about the Deegan matter. On cross-examination, the district attorney properly was allowed to show (a) that there was no conversation at Barnstable about the facts of the Deegan murder and

Commonwealth *v.* French.

that the conversation was confined to describing various efforts to kill Stathopoulos "because he had too much knowledge concerning the Deegan affair," and (b) that Detective Doyle had never given Stathopoulos "any information . . . concerning" Deegan's death or asked him to change his story. This cross-examination was appropriate to rebut any inference from the direct examination of Detective Doyle that Stathopoulos' testimony had been suggested in part by Baron at Barnstable.

## QUESTIONS AFFECTING GLAVIN'S TESTIMONY.

11. Robert Glavin (see *Commonwealth* v. *Glavin*, 354 Mass. 69) testified that he had been confined at the Norfolk prison colony under life sentence for first degree murder. In November, 1967, Glavin was approached by one Ventola at the prison hospital where Glavin was an orderly. As a consequence, Glavin talked with Cassesso. The judge promptly ruled that these conversations could "be used or considered . . . only against . . . Cassesso and against no one else." Cassesso was then "camp chairman" at the colony.

There was an extensive voir dire, at the request of Cassesso's attorney. During this, Glavin testified that Ventola had told him that the "office" wanted Glavin "to cop out" (i.e. wrongly confess to) the Deegan murder, for which, Glavin was told, Cassesso had been indicted. Glavin "had worked for them before." In return they would (1) pay him $50,000 (to be handed to someone, not in prison, chosen by Glavin), (2) "take care of . . . [Glavin's] kids . . . and . . . [3] see if they could do something with the parole board for" him. They were going to "school" Glavin in the facts of the Deegan murder.

Glavin testified that he was not merely "asked" to confess to the Deegan murder but "was really told." He "figured . . . [he] was a patsy" for the "office." He wanted help, spoke to a prison official, and arranged to see F.B.I. Agent Hanlon. Glavin told Hanlon he had been

asked "to cop out . . . and that . . . [he] didn't want to
do it . . . that . . . [he] didn't know what else to do."
Hanlon told Glavin "to go ahead like I was going along with
it." Thereafter Glavin talked with Cassesso alone and even
later with one Lammatino (also known as Chong), Ventola,
and Cassesso. At this talk, a somewhat modified offer (to
put the $50,000 in escrow with a lawyer) was made. Glavin
reported these talks to F.B.I. Agents Hanlon, Condon, and
Rico. The F.B.I. agents told Glavin that they would "do
their best to protect" Glavin and his family. Thereafter,
Cassesso, Ventola, and Lammatino told Glavin that "they
wanted to make sure that they had something on him" so
that he could not "turn around and . . . give testimony
against them." For this reason, they wanted him "to make
a hit" on (i.e. kill) a "guy named McElaney." They gave
Glavin two days to make up his mind.

A prison friend told Glavin that "this hit was just a set-up;
they were going to make a move on" him. Thereafter
Glavin (the object of other inmate hostility) was stabbed by
an inmate not shown to be connected with Cassesso. There-
after, for his own protection, Glavin was put in special cus-
tody. On cross-examination Glavin conceded that his talks
with Cassesso "were to get information . . . about the
Deegan matter," and that he was "pretending to go along
. . . [with the 'cop out' proposal] to get the information
for the FBI."

After the voir dire, the judge concluded that Glavin had
been "approached to commit perjury, to admit . . . a
murder that he did not commit and [that] he . . . [had
been] led to believe that it was not merely an offer but a
threat and that if . . . [Glavin] didn't go through with
it . . . his own life would be imperiled." [31] The judge re-
newed his instructions that the testimony was admitted
only against Cassesso. Glavin then gave before the jury

---

[31] Before the jury, Glavin quoted Cassesso as having asked what he thought
about the "cop out" proposition. Glavin asked, "Do I have a choice?"
Cassesso "just smiled." For discussion of the portion of the charge dealing
with Glavin's testimony see part 14 of this opinion, *infra.*

essentially the same testimony as on the voir dire, except that, by explicit instructions of the judge, Glavin made no mention by name of the "office" or of Lammatino.

Cassesso contends that this testimony was inadmissible under *Massiah* v. *United States*, 377 U. S. 201. Massiah had been indicted on narcotics charges. He had a lawyer and had been released on bail. One Colson, whom Massiah regarded as a confederate, permitted a government agent to install a radio transmitter in Colson's automobile, so the agent could overhear incriminating conversations between Massiah and Colson. A majority of the Supreme Court held that Massiah's "own incriminating statements" thus obtained "could not constitutionally be used . . . as evidence against *him* at his trial." The present circumstances differ from those in the *Massiah* case in various respects.

(a) Before Glavin went to the F.B.I. at all, Ventola had told him essentially all the facts concerning Cassesso's "cop out" proposal. The principal significance of Glavin's direct conversations with Cassesso, after Glavin's talk with Agent Hanlon, was to confirm Ventola's authority to speak for Cassesso. Ventola's original proposal in no way was affected by any later F.B.I. instructions to Glavin. In the *Massiah* case, the incriminating evidence was obtained only by the enticed radio-monitored automobile talk. Thus, Glavin's talks with Cassesso were largely merely cumulative.

(b) Colson (in the *Massiah* case) took affirmative steps, presumably to lessen his own punishment, to elicit the conversations. Here Glavin was trying to protect himself from harm from Cassesso's criminal action initiated before he went to the F.B.I. He merely allowed and reported the continuance of Cassesso's criminal efforts. There was no entrapment. Cf. *Commonwealth* v. *Harvard,* 356 Mass. 452, 458–461.

Cassesso now relies on the reasonable measures, taken by the police to combat his own efforts to commit a further crime and to protect Glavin, as reasons for excluding evidence of those efforts as proof of his consciousness of guilt of the Deegan murder.

We are reluctant to believe that the Supreme Court majority in the *Massiah* case intended it to apply where public officers have obtained knowledge bearing upon old criminal conduct through reasonable efforts to protect the public interest and an individual from a new crime. Even an indicted defendant, in such circumstances, should be estopped to assert that the evidence cannot be used against him to prove the crime with which he is charged merely because he was not warned to have counsel present while he continued his criminal efforts to conceal that crime by obtaining the perjury of another.[32]

We recognize that some cases interpret the *Massiah* case very broadly. See e.g. *Hancock* v. *White,* 378 F. 2d 479, 482 (1st Cir.), which relies greatly on the Supreme Court's per curiam reversal of *State* v. *McLeod,* 1 Ohio St. 2d 60, by *McLeod* v. *Ohio,* 381 U. S. 356. See also *United States ex rel. O'Connor* v. *New Jersey,* 405 F. 2d 632, 634–638 (3d Cir.). Other decisions give the *Massiah* case limited application. See *Davis* v. *Burke,* 408 F. 2d 779, 782 (7th Cir.). See also *Caton* v. *United States,* 407 F. 2d 367, 373–374 (8th Cir.); *People* v. *Milani,* 39 Ill. 2d 22, 26–28 (fellow inmate but not a Federal agent at the time of an indiscreet disclosure by an indicted person); *Anders* v. *State,* 445 S. W. 2d 167, 170–172 (Tex. Cr. App.). In the unusual circumstances of Cassesso's new criminal conduct, Glavin cannot reasonably be regarded as a government agent of the type considered in the *Massiah* and *Hancock* cases.

12. The judge, after the voir dire, instructed Glavin not to use the words "office," "Cosa Nostra," or "they," in describing to the jury the persons responsible for, or connected with, the "cop out" offer. Because Glavin's testi-

---

[32] The conduct of Glavin and the F.B.I. is not like that discussed in *Miller* v. *California,* 392 U. S. 616 (see *People* v. *Miller,* 245 Cal. App. 2d 112, 141–144). The extent of Glavin's knowledge of the Cassesso offer, before he spoke with any F.B.I. agent, distinguishes this case from situations assumed in *Hoffa* v. *United States,* 385 U. S. 293, 308–312, or in *United States* v. *Missler,* 414 F. 2d 1293, 1302–1303 (4th Cir.). For our decisions dealing with the *Massiah* case see *Commonwealth* v. *Guerro,* 349 Mass. 277, 282. See also *Commonwealth* v. *Dougherty,* 343 Mass. 299, 303–305; *Commonwealth* v. *Sullivan,* 354 Mass. 598, 609. Cf. *Commonwealth* v. *McCarthy,* 348 Mass. 7, 11–12 (deliberate, direct police interrogation after indictment).

Commonwealth *v.* French.

mony was admissible only against Cassesso, the judge (perhaps from excess of caution) wished to avoid any possible implication against other defendants in any degree associated with the "office" by earlier testimony.

We have already discussed (see part 1 of this opinion) Baron's vague and general testimony about the "office." There was no clear evidence about what it was or who belonged to it. Baron's testimony did suggest some representation of the "office" by Limone, and that Tameleo had a somewhat greater but wholly indefinite authority to speak for it. At most, the evidence implied that these men either participated in some work of, or took some orders from, a group of significant size engaged in unspecified criminal activities.

We think that references to the "office," not more specific than the few references during Glavin's voir dire, would have had no necessary reference to Tameleo or Limone or to any other defendant. Glavin made no charge against any defendant, except Cassesso, by name. No individual was described as a member of the "office." See *Patriarca* v. *United States*, 402 F. 2d 314, 317 (1st Cir.). Had Glavin referred to the "office" in his testimony before the jury, it would have been pure conjecture that any reference to any other defendant was intended.[33]  Indeed, to show criminality based on mere membership, some degree of active and specific criminal participation in the organization's activities normally would be necessary. See *Scales* v. *United States*, 367 U. S. 203, 224–228.

Cassesso contends, however, that limitations (to prevent mention of the "office") placed upon cross-examination unduly restricted his efforts to show Glavin's testimony to be false or inaccurate, e.g. (a) whether Cassesso had offered to

---

[33] One could hardly say that reference to the F.B.I. or the Internal Revenue Service by itself refers to a particular employee of those agencies. If one joins, takes orders from, or works for an ill-defined organization (e.g. the "Mafia," the "Cosa Nostra") which may have incurred public disrepute, one voluntarily risks that some opprobrium from a general reference to the organization will rub off on him. For a general discussion of such organizations, see Johnson, Organized Crime: Challenge to the American Legal System, 53 J. of Cr. L., Criminology and Police Science, 399; 54 *Ibid.* 1, 127.

get Glavin's sentence reduced and how he expected to per-
form this; (b) who was to pay $50,000; (c) who wanted
Glavin to "cop out"; (d) who had "checked" out Glavin;
and (e) the precise contents of each conversation. It is con-
jectural whether broader cross-examination would have
suggested that it was unlikely that any payment for the
"cop out" would be made, or that (if earned) the payments
would necessarily have come from the same source as the
$50,000 offered by Tameleo and Grieco to prevent Baron's
testimony. Cassesso's counsel did ask questions which
raised some of these issues. Questions which might have
elicited an answer that the "office" supported the offers to
Glavin were not allowed. The only relevance of the question-
ing was to show that others than Cassesso had an interest in
the offers. Such an interest was shown in any event [34] and
diminished the tendency of the offers to disclose conscious-
ness of guilt on the part of Cassesso. Although we perceive
no necessity for the judge's restriction, we see no prejudice.

## MR. FITZGERALD'S TESTIMONY.

13. Mr. John Fitzgerald's testimony has already been
summarized. He had represented Baron in early 1967.
After Baron's coöperation with government authorities be-
came known, Mr. Fitzgerald's automobile was bombed on
January 30, 1968 (see fn. 5). News reports attached to the
brief of Tameleo, Grieco, French, and Salvati show it to have
been an unusually ruthless underworld atrocity.

When Mr. Fitzgerald appeared to testify on July 19, 1968,
the defendants asked that the jury be polled to determine
whether they had any memory from news accounts of the
attack on Mr. Fitzgerald. The trial judge reasonably de-
clined to put any such question at this late stage of the trial.
The lapse of time since the bombing was just eleven days

---

[34] Glavin was allowed to testify that Cassesso said that, with "a new ad-
ministration or a new parole board," an effort would be made, by someone
other than Cassesso, to get Glavin's life sentence commuted. He was not
permitted to say who (presumably "the office") was to do this. Similarly,
Glavin testified that Cassesso told him that someone other than himself would
pay the $50,000 but he was not permitted to say who that person was.

short of six months.  Any inquiry would have called atten-
tion to an irrelevant matter and created a risk of prejudice
where there was to be (and in fact was) no attempt to show
that any defendant was in any way responsible for the
bombing.  See *Commonwealth* v. *Balakin,* 356 Mass. 547, 554.
See also *Commonwealth* v. *Blackburn,* 354 Mass. 200, 203–205.
The Commonwealth cannot be precluded from offering
Mr. Fitzgerald's highly relevant testimony merely because
some juror might suspect a connection between the de-
fendants (all of whom were in custody on January 30, 1968)
and the bomber.  The case is unlike *Commonwealth* v.
*Crehan,* 345 Mass. 609, 611–615, where news articles during
a trial before a jury, not locked-up (as was this jury), gave
indication that defendants had criminal records.[35]

14. Mr. Fitzgerald's testimony of conversations with
Tameleo and Grieco, in July and August, 1967, was orig-
inally admitted against all the defendants.  The judge, how-
ever, concluded that there was no adequate evidence of a
continuing conspiracy against Stathopoulos in July, 1967,
and very clearly limited the testimony (fns. 8, 9) as admis-
sible only against Tameleo and Grieco and not against
others.[36]

The judge, discussing in the charge these conversations,
tried to combine in one sentence statements that Glavin's
testimony was to be considered only against Cassesso and
Mr. Fitzgerald's testimony only against Tameleo and Grieco.
Efforts to correct possible confusion of names resulted in the
charge being left, "[T]he evidence was admitted solely
against them — Grieco and Tameleo . . . .  That was in
. . . Glavin's testimony."  The judge obviously was re-
ferring not to Glavin's but to Mr. Fitzgerald's testimony.

---

[35] The articles here complained of, published over five months before the
trial, dealt principally with the attack on Mr. Fitzgerald, not the conduct
or the records of these defendants.  Cf. *Worcester Telegram & Gazette, Inc.* v.
*Commonwealth,* 354 Mass. 578, 580–581 (direct reference to sentence at Walpole
being served by a defendant).

[36] The judge qualified his instruction by the words "unless and until they
are connected."  This did not restrict his adequate limiting instruction but
merely allowed for the possibility that later testimony might render Mr.
Fitzgerald's testimony admissible against one or more other defendants.

No further exception was saved by any defendant and it would seem that all counsel (if not the stenographer) understood what the judge said as not being confusing.

## DENIAL OF DIRECTED VERDICTS.

15. Tameleo argues that, upon the evidence, he cannot be held as accessory before the fact to Deegan's murder because one who is only a conspirator is not guilty of the substantive offence which is the objective of the conspiracy, and that, to be so liable, one must "participate or aid in the commission of" the substantive offence. See *Commonwealth* v. *Stasiun*, 349 Mass. 38, 47–49. We assume that it is not possible to convict a defendant as an accessory before the fact because of mere acquiescence in the commission of a crime, without active participation as an actor by counselling, aiding, and abetting. See Am. Law Inst., Model Penal Code, § 2.06 (3), Proposed Official Draft, 1962, at one time numbered § 2.04, Tent. draft, No. 1, 1953, pp. 11, 20–50; Anderson, Wharton's Criminal Law & Procedure, § 110, pp. 237–238; Perkins, Criminal Law, 575–578, 593.

The offence of being accessory before the fact involves "counselling, hiring or otherwise procuring." See G. L. c. 274, §§ 2, 3 (see later amendments by St. 1968, c. 206, §§ 1, 2). This language means something more than mere acquiescence but does not require physical participation, if there is association with the venture and any significant participation in it.[37] See *Commonwealth* v. *Stout*, 356 Mass. 237, 240–241. See also *Commonwealth* v. *Bloomberg*, 302 Mass. 349, 352–356; *Commonwealth* v. *Geagan*, 339 Mass. 487, 517–519; *Commonwealth* v. *Doherty*, 353 Mass. 197, 203–205; *United States* v. *Peoni*, 100 F. 2d 401, 402–403

---

[37] See Perkins, Criminal Law, 593, "One of the greatest social menaces of the present day is the man who would be termed an accessory before the fact by the common law but in lay language is referred to as the 'brains' of a crime ring. He tends to put crime on a 'business basis', he recruits members of the 'profession', he provides the means by which crimes are perpetrated on an elaborate scale, and weapons so that death will result from any interference with his plans. The guilt of his terrified underlings, who carry out his commands because they dare not disobey, is certainly no greater than his."

(2d Cir.); *Russell* v. *United States*, 222 F. 2d 197, 198–199 (5th Cir.); *Winger* v. *United States*, 233 F. 2d 440, 441–442 (9th Cir. — accessory may work through an intermediary); *Massicot* v. *United States*, 254 F. 2d 58, 64–65 (5th Cir.); *White* v. *United States*, 366 F. 2d 474, 476 (10th Cir.). Cf. *Commonwealth* v. *Perry, ante,* 149, 152, (evidence showed only that defendant knew and associated with active participants before and after a robbery); *Morei* v. *United States,* 127 F. 2d 827, 831–832 (6th Cir.).

Baron's testimony warranted the conclusion that Tameleo was linked to the enterprise. He was charged (B–2, B–15) with knowledge of Limone's contract offers (B–1, B–11) as to both Deegan and Stathopoulos. He explained in some measure his reasons for wanting Deegan killed (B–2). He said of Deegan, "He definitely goes," and gave his "okay" to this murder and to the proposal to kill Stathopoulos. This could be inferred to be not mere approval but affirmative specific encouragement in circumstances which Tameleo should have realized removed existing barriers to carrying out the conspiracies. Fitzgerald's testimony about Tameleo's and Grieco's efforts to bribe Baron tended to show Tameleo's consciousness of guilt. From the testimony, the jury could infer that Tameleo adhered to the enterprises to kill both Deegan and Stathopoulos and that he furthered them by encouraging, and perhaps ordering, Baron to go forward with them.[38]

16. Limone, upon Baron's testimony, could have been found to have initiated the plan and to have paid for

---

[38] The judge in his charge said of the evidence concerning Tameleo, that Baron in effect said, "'. . . I am hired to kill Deegan, is that right?' And he said, 'That's right.' Well now, if you find that to be the truth, he is guilty of conspiracy. And there is testimony, if you accept it, that . . . [Baron] said to Tameleo, 'I understand the office wants to give me a contract to take care of Deegan, is that right?' 'That's right.' 'Well, I will do it if you say so. I won't if you don't,' or words to that effect. . . . There were words, to the effect, if you believe it, 'If you encourage me, if you induce me, if you command me and I get your approval, I will do it.' Well, that's a little more than a conspiracy. That's being an accessory before the fact. On the other hand, you may find the facts to be that . . . [Baron] said, 'I got a contract to kill Deegan.' It's like my telling you I'm going to break into a safe tomorrow and you say to me, 'Well, good luck to you.' You are not part of a conspiracy with me just because I tell you I am going to commit a crime. You are not encouraging me, you are not inducing me, you are not commanding me."

Deegan's murder. There thus was evidence that he not only conspired with Baron (and through Baron with the other defendants) to murder Deegan but also took affirmative action. See *Commonwealth* v. *Stout*, 356 Mass. 237, 240–241.

A "substantive offence and a conspiracy to commit that offence" each constitute a "distinct offence and each may be separately punished." See *Commonwealth* v. *Stasiun*, 349 Mass. 38, 48; Anderson, Wharton's Criminal Law & Procedure (1957 ed.), §§ 34, 110–111. The evidence concerning Limone warranted finding him guilty as an accessory before Deegan's murder and of each of the two conspiracy charges.[39]

17. Salvati was present in Cassesso's apartment when plans were made. He could have been found to have been with Baron and Cassesso on the evening of Deegan's murder, with a pistol, wearing a wig as disguise, and assisting Baron. He received pay of $750 for his night's work. Baron's testimony, if believed, reasonably permitted the inference that Salvati participated in not only the plan to kill Stathopoulos but also the closely related plan to kill Deegan.[40]

MISCELLANEOUS ASSIGNMENTS CONCERNING CONDUCT
OF THE TRIAL.

18. In argument the assistant district attorney commented on the failure of the defendants to call Mr. Farese who had attended conferences with Mr. Fitzgerald and Grieco. Upon objection, the judge explained that where "a witness is available to either side, then neither side can comment on it." He said that, because Cassesso's attorney had "said he was going to call him . . . and . . . didn't"

---

[39] Nothing in *Commonwealth* v. *Favulli*, 352 Mass. 95, 108–110 (discussing bribery and a conspiracy to bribe) has any relation to the type of charges now before us. See Anderson, Wharton's Criminal Law & Procedure, § 89; Perkins, Criminal Law, 535–536.

[40] The ample evidence of conspiracy and of presence and participation warranted the denial of Cassesso's motion for directed verdicts (and also Grieco's and French's similar motions, assignments of error as to which do not appear to be argued by them).

the comment was justified. Mr. Farese could have been called by the Commonwealth as well as by Cassesso. The judge's explanation put the argument in proper context, and the judge expanded upon this explanation in his charge. See *Commonwealth* v. *Webster*, 5 Cush. 295, 316; *Commonwealth* v. *Domanski*, 332 Mass. 66, 70–71; Anderson, Wharton's Criminal Evidence (12th ed.), §§ 144–145. There was no prejudice. See *United States* v. *Dibrizzi*, 393 F. 2d 642, 646 (2d Cir.).

19. During Baron's direct testimony he was asked about a conversation with Grieco about March 7, 1965, after the latter's alleged return from Florida. Five attorneys objected. The judge said, "I am going to ask the jury to draw their own inferences from the interruptions. . . . [I]f the purpose . . . is to break the narration . . . that's one thing. . . . I'd like to have the jury get the evidence which is admissible." In the preceding twenty-five pages of the transcript there had been numerous exceptions and also many objections without claiming an exception. Some of these objections seem to have been repetitive. The judge obviously thought that the orderly course of the testimony was being unduly broken.

Neither the judge nor counsel should make adverse comment on reasonable objections by counsel. See *Commonwealth* v. *Balakin*, 356 Mass. 547, 551, and cases cited. In context, the trial judge's remark was not criticism of ordinary or reasonable objections, but merely a comment, in effect, that the defence objections had been unduly frequent. The remark, in the middle of a long trial (fn. 2), amounted only to an admonition to avoid unnecessary delay and interruption. The matter was adequately dealt with in the charge, in the circumstances. *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 226–229.[41] This resembled the

---

[41] The judge charged, among other things, ". . . you are to judge this case purely by what you hear within the four walls of this courtroom. Judge the parties; judge the witnesses; judge the officers; yes, even the presiding justice. Examine them all. Make your own impressions. . . . [J]udge the attorneys, also, in their conduct. . . . The duty of a judge is to be the directing head of a trial. He is cognizant of the . . . responsibility . . . on . . .

corrective charge approved in *Commonwealth* v. *Lewis,* 346 Mass. 373, 379, fn. 2.

20. Cassesso's counsel refers to a number of instances in which he accuses the trial judge of making "disparaging" and "intemperate" comments about defence counsel. He argues that the cumulative effect was to deny Cassesso a fair trial. The record indicates that the trial judge tried to keep the trial on an orderly course and to avoid prejudicial occurrences. We perceive no justification for Cassesso's contention about cumulative error in any of the specific instances referred to in Cassesso's brief as supporting the contention. Indeed, in at least one instance, Cassesso's counsel persisted in disregarding the judge's instructions to examine his witness "without putting the words in his mouth." In this long trial, which must have taxed judicial patience (see *Commonwealth* v. *Lewis,* 346 Mass. 373, 379), we do not perceive judicial conduct in any degree comparable to that criticized in the cases relied on by Cassesso. See e.g. *Bursten* v. *United States,* 395 F. 2d 976, 982–987 (5th Cir.). See also *United States* v. *Guglielmini,* 384 F. 2d 602, 604–605 (2d Cir.).

ADDITIONAL MATTERS RELATING TO THE CHARGE.

21. Certain defendants contend that the judge should have charged that the testimony of Baron, obviously an accomplice, must be "received with suspicion and acted upon with great caution." The judge in fact charged, "[A] person who admits himself to be an accomplice of a crime is a criminal himself, and that in itself raises a question, but that does not mean that you cannot believe an accomplice. The evidence of an accomplice need not be corroborated by other witnesses. Whether you should believe it . . . re-

each attorney, and sometimes it is not an easy matter to maintain discipline. . . . But now let me say — Don't punish the clients for the acts of the attorneys, not unless the clients have something to do with it. The attorneys are here as officers of the Court, entrusted with a great responsibility. The attorneys are not on trial. The defendants are on trial. You are to bring in verdicts for or against the defendants — not the attorneys."

Commonwealth *v.* French.

mains for you to say."[42] A trial judge may tell the jury
to scrutinize the testimony of an accomplice with care,
especially when the testimony is not corroborated. See
*Commonwealth* v. *Giacomazza,* 311 Mass. 456, 464. He is not
required to do so. See *Commonwealth* v. *Binkiewicz,* 342
Mass. 740, 752–753. See also *Commonwealth* v. *Lammi,* 310
Mass. 159, 164–165; *Commonwealth* v. *Geagan,* 339 Mass.
487, 518.

The judge properly did not charge that Mr. Fitzgerald's
testimony should be viewed with caution on the ground that
he might conceivably have been found to have been an ac-
cessory after the fact.

22. Tameleo argues that the judge should have told the
jury to disregard all evidence introduced after Tameleo
rested at the close of the Commonwealth's case, when his
motion for a directed verdict was denied. The argument
relies on the following circumstances.

In the course of a long conference, with the jury absent,
the judge, although Tameleo had rested or was about to
rest, required him and his counsel to remain thereafter during
the trial in the court room. This they did. The assistant
district attorney, in the course of this conference, made it
plain that he, by cross-examination of witnesses called by
the defence, would continue efforts to establish Tameleo's
guilt. He said that he would tell Tameleo's counsel "right
now that I intend to elicit from them [i.e. defence witnesses],
if I can, evidence that will definitely incriminate . . .
Tameleo." He was explicit in requesting that Tameleo's
counsel be present "because in the cross-examination of
witnesses, I definitely intend to ask them if they know that
man." The judge, in answer to a statement of the assistant
district attorney "that the Commonwealth can always open
up its case again and . . . put in further evidence against"

---

[42] The judge then referred to the Commonwealth's contention "that there
was plenty of corroboration" and indirectly to the then recent arguments
which, for the defence, had been that there was no corroboration. The judge
then said, "[I]f you are . . . convinced beyond a reasonable doubt that the
defendant is guilty, you can find that defendant guilty even on the uncor-
roborated testimony of an accomplice . . . who is not on trial."

Tameleo, agreed that such action was "in the discretion of the [c]ourt" and later said, "that as far as . . . Tameleo is concerned, the case is closed unless there is other evidence that may be introduced against him. And I will have to admit it if it comes in."

Obviously, in this joint trial of several defendants under conspiracy, murder, and accessory indictments arising from the same events, the jury could not proceed at once to decide the charges against Tameleo separately. In our opinion the judge correctly required the continued attendance of Tameleo and his counsel. We think also that the judge had the discretion to receive, and to state that he would receive, against Tameleo any later evidence concerning him which might be brought out through defence witnesses. His discretion was not abused by the course adopted. See *Commonwealth* v. *Eastman,* 1 Cush. 189, 217; *Commonwealth* v. *Wood,* 302 Mass. 265, 267–268. See also *Commonwealth* v. *Agiasottelis,* 336 Mass. 12, 15; *Commonwealth* v. *Greenberg,* 339 Mass. 557, 583; *Commonwealth* v. *Fancy,* 349 Mass. 196, 204. In the circumstances, it remained Tameleo's counsel's duty to bring to the judge's attention promptly and as they arose any matters which he deemed prejudicial to his client. In any event, the matters arising after Tameleo rested (see e.g. fn. 23, *supra*), referred to as harmful to Tameleo in the brief for his client and others, do not appear to be of great significance.

23. In considering whether, in these capital cases, any action is appropriate under G. L. c. 278, § 33E (as amended through St. 1962, c. 453), we give weight to the fact that the principal issue before the jury was one of Baron's credibility. On Baron's testimony alone, if the jury reasonably accepted it, there is no necessity for action by us under § 33E, despite the numerous assignments of error which have been argued.

We, of course, did not hear Baron's testimony. It is before us only in written form. We would hardly expect in a case like this to find that each key witness had a spotless reputation. We recognize, as the jury doubtless did, that Baron

and Stathopoulos had various possible incentives and motives for testifying. They obviously hoped to obtain mitigation of potential punishment for various offences. They presumably wished to assure themselves of continuing police protection. Baron had a long criminal record and "was a highly vulnerable witness." See *Patriarca* v. *United States,* 402 F. 2d 314, 319 (1st Cir.). The record of Stathopoulos was less serious.

Mr. Fitzgerald also understandably may have entertained hostility toward Tameleo and Grieco (against whom his testimony was admitted). He may have suspected their friends of having caused him serious injury (see fn. 5). Cassesso's conviction may have depended to some extent on the testimony (admitted only against him) of Glavin, who also had a serious criminal record. Glavin's testimony, of course, could have been affected by self-interest.

These witnesses (Baron, Stathopoulos, Glavin and Mr. Fitzgerald) were before the jury for long periods. The jury saw and heard them. The jurors, when they retired to deliberate, were in a far better position to appraise the witnesses and what was said than we now are. They had heard full discussion of all imaginable infirmities in the vital testimony of these witnesses. They were warranted in believing the testimony. Accordingly, nothing in the record indicates to us reason for exercising any special powers given to us by § 33E.

24. Questions argued which seem to us of lesser importance are discussed in the Appendix, as already noted.

*Judgments affirmed.*

## APPENDIX.

Various less significant issues raised by assignments of error are discussed in this Appendix.

### MISCELLANEOUS PROCEEDINGS BEFORE TRIAL.

A-1. There was no error in following the usual Massachusetts practice of furnishing the defendants with the names of witnesses before the grand jury. *Commonwealth* v. *Jordan*, 207 Mass. 259, 264. The defendants could move for access to any witnesses in protective or other custody (see *Commonwealth* v. *Doherty*, 353 Mass. 197, 211; see also *Commonwealth* v. *Balliro*, 349 Mass. 505, 515–518) and might show specific need for the judge to exercise his discretion to afford them further information about other witnesses. It was wholly reasonable for the judge and the Commonwealth to be apprehensive about the safety of witnesses (see fn. 5). No statute (cf. 18 U. S. C. § 3432 [1964]; *Gregory* v. *United States*, 369 F. 2d 185, 187–188 [Ct. App. D. C.]) required furnishing the defendants the names and addresses of prospective witnesses.

A-2. The trial judge was not required to grant motions for inspection of exculpatory evidence, or of the results of scientific and other examinations made in connection with the case, in the absence of greater specification of the areas of desired inquiry. See *Commonwealth* v. *Noxon*, 319 Mass. 495, 534–535. Similarly, there was no adequate specification of evidence illegally obtained to which the defendants desired access. There was no later indication that evidence, offered by the Commonwealth, had been illegally obtained.

A-3. The trial judge within his discretion denied motions for access to police reports. See *Commonwealth* v. *Marsh*, 354 Mass. 713, 721–722. See also *Commonwealth* v. *Roy*, 349 Mass. 224, 227. Even if the reports constituted public records (G. L. c. 4, § 7, Twenty-sixth, as amended through St. 1962, c. 427, § 1; see St. 1969, c. 831, § 2), a question which we need not decide, other remedies existed. See *Lord* v. *Registrar of Motor Vehicles*, 347 Mass. 608, 610–612. See also G. L. c. 66, § 10, as amended through St. 1948, c. 550, § 5. A police report, specified as of possible significance, was that of a police captain (see fn. 7). That report was in fact produced at trial.

A-4. In the absence of adequate showing that any written statement was taken from any defendant, or that Baron signed any such statement, there is no basis for contending that the judge abused his discretion by denying motions in advance of trial for examination of such statements. See *Commonwealth* v. *Chapin*, 333 Mass. 610, 617–618; *Commonwealth* v. *Ries*, 337 Mass. 565, 583. See also *Walsh* v. *United States*, 371 F. 2d 436, 437 (1st Cir.), cert. den. 387 U. S. 947. Cf. *Commonwealth* v. *Giles*, 353 Mass. 1, 18–19 (allegedly criminal testimony in perjury cases). The judge prior to trial indicated that he would make any such statements available when Baron took the stand. The motions were renewed at trial, but arguments on these then were confused with discussion of requests for Baron's grand jury testimony. Even then, there was no showing of the existence of any written statements by Baron.

A-5. There was no abuse of discretion in the denial of motions to interview Stathopoulos and Baron in advance of trial. Each was interviewed by the judge in the presence of defence counsel. Each said that he did not wish to be interviewed. See *Commonwealth* v. *Doherty*, 353 Mass. 197, 210–211.

A-6. The trial judge also denied motions to have the assistant district attorney inform defence counsel of the whereabouts of Mrs. Baron so that she could be interviewed. The assistant district attorney, on May 6, 1968, represented that she was in "protective custody [of Federal authorities], although . . . free to come and go."

On May 27, 1968, Mrs. Baron filed an affidavit that she did "not want to be interviewed by any [defendants'] lawyers." Abuse of discretion has not been established. The defendants have not shown that they asked Federal authorities to permit them to talk to Mrs. Baron. She was not in State custody. Cf. *Commonwealth* v. *Carita*, 356 Mass. 132, 142–143.

A–7. The trial judge was not obliged to require the Commonwealth to furnish any pre-trial information concerning the motives which might lead any proposed witness to testify. Baron, Stathopoulos, and Glavin all were available for, and subjected to, extensive cross-examination.

A–8. Action on Cassesso's motions for particulars was within the sound discretion of the trial judge. See G. L. c. 277, § 40. See *Commonwealth* v. *Bartolini*, 299 Mass. 503, 509; *Commonwealth* v. *White*, 353 Mass. 409, 412–413, cert. den. 391 U. S. 968; *Commonwealth* v. *Baron*, 356 Mass. 362, 364–365, and cases cited.

Although the motions were denied as having been filed late, the indictments were substantially in the statutory forms and were adequate. See G. L. c. 277, § 79 (accessory before the fact, murder, and conspiracy). See *Commonwealth* v. *Norton*, 339 Mass. 592, 593.

A–9. The trial judge was not required to conduct a public opinion poll of the community to determine whether the defendants could receive a fair trial. See *Commonwealth* v. *Blackburn*, 354 Mass. 200, 204–205.

A–10. Other pre-trial contentions of the defendants need not be discussed.

QUESTIONS RELATING TO THE JURY.

A–11. Baron filed a plea of guilty to the conspiracy indictments on May 27, 1965, just as the trial began and before the jury had been selected. To avoid inappropriate publicity, the trial judge might well have accepted the plea after the jury had been empanelled and sequestered. This was within his discretion. *Commonwealth* v. *Sousa*, 350 Mass. 591, 595. *Commonwealth* v. *Subilosky*, 352 Mass. 153, 161–162. Baron's plea could hardly have been kept from the jury. He admitted in his testimony full complicity in the project of killing Deegan and Stathopoulos. Any newspaper publicity about the plea cannot have been prejudicial. The judge in his charge sensibly told the jury what intelligent jurors already must have inferred. Cf. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 470.

A–12. The trial judge had discretion (see *Commonwealth* v. *Geagan*, 339 Mass. 487, 504) to excuse veniremen in the absence of the defendants and counsel. See G. L. c. 234, § 1A (inserted by St. 1949, c. 347, § 2); *Joyce* v. *Hickey*, 337 Mass. 118, 122–123.

A–13. *Witherspoon* v. *Illinois*, 391 U. S. 510, 515, was decided on June 3, 1968, while this jury was being selected. Limone June 4 waived exceptions previously saved to the judge's action in excusing jurors without adequately exploring their views on capital punishment. His counsel argues that later the judge improperly excluded some jurors, even though he appears to concede that "thereafter the judge excluded only those . . . who said that they could not vote for the death penalty." In his brief, Limone has not specified any juror whom he claims was improperly excluded under the principles reviewed in *Commonwealth* v. *Sullivan*, 354 Mass. 598, 608–609, cert. den. 393 U. S. 1056. See *Commonwealth* v. *Nassar*, 354 Mass. 249, 255–257.

The judge's action in excusing fourteen veniremen, specified by Limone, is not shown to have been arbitrary. The judge saw those excused. He was entitled to exercise judgment, within a substantial range of discretion, concerning the capacity and suitability of each of them intelligently to perform the functions of a juror. The judge did not abuse this discretion in determining that five specified jurors stood indifferent. An exempt temporary teacher of woodworking in the public schools (see G. L. c. 234, § 1, as amended through St. 1949, c. 347, § 1; see later amendment, St. 1969, c. 148, § 1) was not precluded from serving. See cases discussing whether to set aside a verdict in which an exempt juror has joined, *Munroe* v. *Brigham*, 19 Pick. 368, 369–370 and *Moebs* v. *Wolffsohn*, 143 Mass. 130, 131. See also *Commonwealth* v. *Hayden*, 163 Mass. 453, 455; *King* v. *United States*, 346 F. 2d 123, 125 (1st Cir.). A State employee (director of social services of the Massachusetts Commission on Aging) does not seem to us the type of person automatically to be disqualified for bias in a criminal case by reason of his office. *United States* v. *Wood*, 299 U. S. 123, 132–141. *Dennis* v. *United States*, 339 U. S. 162, 168–172. Cf. *Boston* v. *Baldwin*, 139 Mass. 315, 317 (member of Boston com-

mon council disqualified in a city case); *Commonwealth* v. *Moore,* 143 Mass. 136, 138–140 (member of city league to enforce law and order disqualified to sit as juror in prosecution initiated by the league's agent).

A–14. The judge reasonably dealt with the complaints of certain defendants about the conduct of a court officer, who, during the selection of the jury, reported to the judge the inquiry of a juror, thereafter excused (see *Commonwealth* v. *Monahan,* 349 Mass. 139, 159–160), about his possible disqualification. The judge was not required to believe affidavits of the de-. fendants concerning other conduct of the same court officer. Cf. *Mattox* v. *United States,* 146 U. S. 140, 149–151. Cf. also *Woodward* v. *Leavitt,* 107 Mass. 453, 458–459, 471.

A–15. The judge could properly make inquiry (during trial and long before the case was sent to the jury) of the foreman, in the court room but in the absence of counsel, whether the locked-up jury had any suggestions or complaints concerning their care and treatment. Cf. *Sargent* v. *Roberts,* 1 Pick. 337, 339–342 (communication between judge and jury during jury deliberation); *Lewis* v. *Lewis,* 220 Mass. 364, 366–371 (same).

A–16. It was of no consequence that, by what appears to have been a sheer accident, a witness and the jury passed each other in the same stairwell during a recess.

A–17. The judge did not abuse his discretion in excusing veniremen who had read an article or articles in a Chelsea newspaper. One bore the headline "Baron Pleads Guilty to Participating in Local Gangland Slaying" and referred to a somewhat obscure court room colloquy between defence counsel and Baron. Although the articles do not seem very prejudicial, the judge could reasonably conclude that jurors who had read them should be excused.

## QUESTIONS CONCERNING DEFENDANTS' TESTIMONY.

A–18. On cross-examination, Limone was asked questions about his vending machine business. The matter had been opened up on direct examination. Questions concerning his cash available on March 13, 1965, from the sale of the business or otherwise, may have had some significance. See par. A–32, *infra.*

On direct examination Limone denied that he had "engaged in any loan sharking." It was permissible on cross-examination to inquire whether Limone was a "shylock" in 1965, in view of (1) an earlier admission of the receipt of interest on "cash personal loans," and (2) Baron's testimony about having paid Limone such interest or "vigorish." To most of these questions no exception was saved, including a question whether Limone had a license to lend money. See G. L. c. 140, § 110 (as amended through St. 1962, c. 795, § 2; see later amendment by St. 1967, c. 196); *Commonwealth* v. *Douglas,* 354 Mass. 212, 219. This does not appear to have been a prejudicial inquiry beyond the discretion of the trial judge. See discussion in *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 754–756.

Questions concerning the "dog house" may have had relevance (cf. *Jones* v. *Commonwealth,* 327 Mass. 491, 492–497) in view of Baron's testimony about meeting Limone near that place and being offered a "contract" represented as approved by the "office." In any event, a question whether the "dog house" was "a meeting place for the Cosa Nostra" was answered in the negative. A mistrial was not required merely because of use of the term "Cosa Nostra." See part 12 of this opinion.

Subject to Limone's exception, he was asked to tell "some of the other people that . . . [he had] hung around with . . . [at the dog house] in . . . 1965." This led to mention of one Gennaro Anguillo who, at the time of this trial, had recently been acquitted in a trial "during which he had been portrayed in the Boston press as a leader of the underworld." The impropriety, if any, was not seasonably brought to the attention of the trial judge by prompt exception.

A–19. We cannot say that the trial judge abused his discretion about the scope of cross-examination concerning matters conceivably bearing upon the truth of Grieco's alibi testimony that he was in Florida in March, 1965. There

Commonwealth *v.* French.

were no exceptions to many questions discussed in the defendants' joint brief.

A–20.   Mr. Fitzgerald, in describing his conversations with Tameleo and Grieco, gave testimony, clearly hearsay, about facts then discussed (e.g., Baron's motives for testifying) which he must have learned from Baron and Stathopoulos.   Most of this testimony was cumulative of testimony already given.   No request for any limiting instruction was made when the trial judge denied Tameleo's motion that Mr. Fitzgerald's answer concerning Baron's motives be struck.

A–21.   Baron and Stathopoulos waived the attorney-client privilege to permit Mr. Fitzgerald to testify.   French did not give such a waiver.   Mr. Fitzgerald gave cumulative testimony that he observed blood on French's clothing and shoe at the Chelsea police station on the night of March 12–13, 1965.   No attorney-client privilege extends to appearances or acts observed by others and not in confidence.   *State* v. *Fitzgerald,* 68 Vt. 125.   *Brown* v. *Foster,* 1 H. & N. 736, 739–740.   See *Colton* v. *United States,* 306 F. 2d 633, 636–637 (2d Cir.), cert. den. 371 U. S. 951;   *United States* v. *United Shoe Mach. Corp.* 89 F. Supp. 357, 358–359 (D. Mass.);   Wigmore, Evidence (McNaughton rev.) § 2306 (pp. 589–590), § 2311 (pp. 601–602);   McCormick, Evidence, §§ 92–95.   Cf. *Robson* v. *Kemp,* 1 Esp. 233, 235 (K.B.).

## MISCELLANEOUS TRIAL MATTERS.

A–22.   Cassesso's counsel had obtained from another Superior Court judge Glavin's testimony before a Norfolk County grand jury in connection with indictments of Cassesso and others for attempting to get Glavin to commit perjury.   Cassesso's counsel was permitted on various occasions to use these minutes (marked for identification) to refresh Glavin's recollection.   He was not allowed to use the minutes themselves to show Glavin's prior inconsistent statements, unless and until he proved the minutes in usual course.

The judge permitted wide questioning about the prior statements.   Cassesso's counsel did not make an attempt to prove, through the stenographer or otherwise, any prior inconsistent statements before the grand jury.   He cannot now complain.   *Commonwealth* v. *Doherty,* 353 Mass. 197, 210.

A–23.   There was no error in refusing to allow Tameleo's counsel to cross-examine Glavin on the voir dire.   Glavin's testimony was admissible only against Cassesso.   Cassesso's counsel had cross-examined Glavin.   The extent of cross-examination on the voir dire, by counsel for the defendants against whom the evidence was not admitted, was a matter within the discretion of the judge.   *Commonwealth* v. *Morrell,* 99 Mass. 542, 545.   See *Commonwealth* v. *Hall,* 164 Mass. 152, 154–155;   Wigmore, Evidence (3d ed.) § 1385;   McCormick, Evidence, § 53, pp. 122–126.   See as to cross-examination generally, *Commonwealth* v. *Nassar,* 351 Mass. 37, 43–44;   *Commonwealth* v. *Nunes,* 351 Mass. 401, 405–406.

The judge in his discretion could require counsel for the defendants other than Cassesso to proceed at once (if they were to do so at all) to cross-examine Glavin before the jury.   They had heard Glavin's direct testimony and cross-examination, both before the jury and at voir dire.   See Wigmore, Evidence (3d ed.) § 783, p. 150, fn. 3.

A–24.   At the close of the defendants' cases, Cassesso's counsel sought to recall Glavin (as Cassesso's witness) to examine him (a) about certain testimony in his trial in Worcester County for the murder of a person other than Deegan, which tended to show that, when arrested for that crime, he had been afraid that the "mob" would have somebody at Bridgewater or Walpole kill him (cf. his testimony in the present case that he had been "checked out" in behalf of Cassesso as to his reliability for carrying out the "cop out" project), and (b) to prove a certified copy of the Norfolk grand jury minutes prior to Cassesso's and Ventola's indictments for trying to suborn perjury by Glavin.   As noted above, there had already been extensive cross-examination of Glavin concerning these minutes.   Examination of the material, attached to the request to recall, on short notice, Glavin (who was in protective custody "two and a half hours away from" Boston), does not show that it was of such sig-

nificance as to necessitate further delay at the end of a long trial. See Anderson, Wharton's Criminal Evidence (12th ed.), § 899.

A–25. Cassesso was not deprived of proper opportunity to show that Glavin was not removed to protective custody solely because of his fear of Cassesso. In cross-examination, Cassesso's counsel was permitted reasonably to inquire about an attack on Glavin by another inmate. The judge was not required to force Glavin to disclose who stabbed him where Glavin had testified that the person was not either Cassesso or Ventola and where it was represented that disclosure of the name might result in injury to the person concerned.

A–26. There was no error in the reception by the judge from the district attorney of a memorandum (not furnished to the defendants or received in evidence or marked for identification) apparently concerning questions of evidence likely to arise during trial. This procedure apparently arose out of a suggestion during a conference at which defence counsel were present. No objection to the suggestion was voiced by any counsel.

A–27. Various incidental remarks were made by witnesses and counsel, some of which should have been left unsaid. Exceptions saved to incidents of the proceedings must be viewed in the perspective of a long trial (see fn. 2) conducted for well over a month during hot July weather. As in *Commonwealth* v. *Lewis,* 346 Mass. 373, 378–380, it would unduly "prolong this opinion to discuss" these in detail. See part 5 of opinion.

Some cross-examination unduly baited Baron, as a witness, and the assistant district attorney, into inappropriate remarks. These include an understandably exasperated protest by the assistant district attorney at Grieco's attorney's cross-examination of Baron, obscure references to a request by Limone's counsel for grand jury minutes, and a remark by the prosecutor when he reasonably thought counsel for Cassesso was trying to avoid the judge's instructions on the cross-examination of Glavin. A reference by the assistant district attorney to "grand jury testimony in another case where this man [Cassesso] is presently a defendant" was not very clear. The judge promptly instructed the jury that it be disregarded. The assistant district attorney's reference to a question by Cassesso's counsel as a "[t]rick question" was prompted by counsel's inquiry in a manner which the assistant district attorney reasonably feared would mislead the witness. See *Commonwealth* v. *Geagan,* 339 Mass. 487, 515–518 (remarks warranted by prior remarks on evidence); *Commonwealth* v. *Subilosky,* 352 Mass. 153, 167–168. See also *Commonwealth* v. *Lewis,* 346 Mass. 373, 379. No prejudice has been established.

A–28. Carmine Puopolo failed to respond to a summons "left at" his house. The judge offered to issue a capias. The assistant district attorney declined the offer because he did not wish to "delay the case any longer." In argument, however, he started a rhetorical question, "Is it coincidental . . . that when the Commonwealth calls . . . Puopolo, he's not anywhere to be – –" The argument was interrupted and was never finished. It thus was not prejudicial.

A–29. During his argument the assistant district attorney reviewed Baron's reasons for going to see Tameleo. He then said, "Of course you have to use your imagination. There are many things in a court of law that can't be introduced." The sentence last quoted was not proper (see *Kitchell* v. *United States,* 354 F. 2d 715, 719 [1st Cir.]) but the judge promptly gave adequate corrective instructions. See *Commonwealth* v. *Cabot,* 241 Mass. 131, 150–151.

The assistant district attorney shortly thereafter said, "I expect a lot of interruptions." Objection was made. By itself the remark was not significant enough to constitute improper comment on reasonable objections by the defence. *Commonwealth* v. *Balakin,* 356 Mass. 547, 550–551. In any event, no exception was saved.

A–30. In argument the assistant district attorney referred to Baron's testimony that he met Cassesso in Florida, and then said, "There's no denying by anyone that . . . Cassesso was not there." This cannot be interpreted as comment on Cassesso's failure to take the stand. Any person who had seen Cassesso elsewhere at the designated time could have testified to the fact, for it was not within Cassesso's exclusive knowledge. See *Commonwealth* v. *Gerald,* 356 Mass. 386, 391–392.

A–31. The judge reasonably stopped cross-examination of Stathopoulos, by Limone's counsel, which he thought to reflect unfairly on the behavior of the witness. *Commonwealth* v. *Lewis*, 346 Mass. 373, 379. A question had suggested that the witness was looking at the assistant district attorney for help with each question. The judge said, "There's no evidence whatever of that. The [c]ourt has been watching. That is a false statement."

Similarly, the judge did not abuse his discretion by requiring counsel on cross-examination to refer to xerox copies as such instead of treating them as originals. If the judge, in referring to the question as "false" spoke with unnecessary force, any error was trivial.

A–32. Limone, on cross-examination, was asked about his use of $51,500 in cash received by him in 1965 from the sale of a vending machine business. Baron had described himself as a "loan shark" or "shylock." There had been testimony that in 1965 Limone had lent money on personal and business loans (sometimes at twenty-four per cent a year) to bring him interest income of $2,100. When Limone's counsel objected to the inquiry the judge commented that it was "material whether this man was a money lender, also, the same type as he described . . . Baron . . . [w]hether the birds are of the same feathers or not. That's what he is trying to prove." The answers on cross-examination suggested (a) that Limone was not the hardworking small business operator which he had claimed to be on direct examination; (b) that he may have had closer association with Baron than Limone had admitted, if they in fact operated in the same business in the same area; and perhaps also (c) that Limone had cash available from which he could have paid $7,500 for Deegan's murder. The judge's casual remark was not, in context, to be construed as approving any theory of guilt by association. See par. A–18, *supra.*

A–33. The assistant district attorney in his opening asked the jury to look not only at the witnesses but "at the defendants during the course of this trial" for their "physical characteristics" and "with regard to the story that is told about them." On objection the judge permitted the remarks to stand and asked the "jury to look at the judge and all counsel and all parties . . . including the district attorney." These remarks amount to no more than a suggestion that the jurors carefully watch what was going on as an aid to appraising the evidence. See fn. 41.

A–34. On cross-examination, Cassesso's counsel asked Glavin certain questions which the judge thought might violate his instructions not to ask questions which might elicit answers containing references to the Cosa Nostra or the "office" or to other defendants against whom the answers were not admissible. At one point after suggesting the impropriety of the particular inquiry, the judge said, "You are not going to prejudice the rights of anyone else in this court room. Now, that is the reason why I am excluding it." Cassesso saved an exception. In context the judge's remark was a method of telling counsel to obtain his information in a manner which would not require mentioning defendants other than Cassesso.

A–35. The judge, in admitting certain evidence, said, "There is a higher court that reviews everything I do." After an exception, he added, "[E]verything I rule on is subject to review by . . . the Supreme Judicial Court. And I have also told . . . [the jury] that their decision, however, on the facts or as to who to believe . . . is not reviewed . . . that their word is final on that." These remarks were not likely to reduce the jury's sense of responsibility. The judge made it plain that the jury had the final decision of issues of fact and credibility. There was no error. Cf. *Commonwealth* v. *Ladetto,* 349 Mass. 237, 247–248 (improper reference to possible executive clemency adequately corrected by charge); *State* v. *Clark,* 227 Ore. 391, 393. Cf. also *Pait* v. *State,* 112 So. 2d 380, 384–386 (Fla.); *Faust* v. *State,* 222 Ga. 27, 29; *People* v. *Esposito,* 224 N. Y. 370, 376–377; *People* v. *Silverman,* 252 App. Div. (N. Y.) 149, 174; annotations, 3 A. L. R. 3d 1448; 5 A. L. R. 3d 974.

A–36. Toward the close of a hot day, the trial judge declined to suspend the trial at 4 P.M. but insisted that cross-examination by Cassesso's counsel of Glavin, then on the stand, be completed that afternoon. "We are not going to start all over tomorrow and have him repeat the same questions." Judicial comment upon "unusually protracted" cross-examination has been held per-

missible. *Commonwealth* v. *Coughlin,* 182 Mass. 558, 564. See *Smith* v. *Boston Elev. Ry.* 208 Mass. 186, 187. See also *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, 525; *LaCroix* v. *Zoning Bd. of Appeals of Methuen,* 344 Mass. 489, 490. It was for the judge to determine, within a wide range of discretion, whether there was chance of completing that day cross-examination of a particular witness and the manner in which he would encourage avoidance of repetition.

## MATTERS CONCERNING THE CHARGE.

A–37. The judge read from *Commonwealth* v. *Webster,* 5 Cush. 295, 319, the paragraph concerning alibi testimony. He also charged with respect to proof by the Commonwealth of guilt beyond a reasonable doubt and made it clear that the burden of such proof rests upon the Commonwealth and not upon a defendant. There was no error. See *Commonwealth* v. *Geagan,* 339 Mass. 487, 518; *Commonwealth* v. *Nassar,* 351 Mass. 37, 49; *Commonwealth* v. *Rogers,* 351 Mass. 522, 532; *Commonwealth* v. *Sullivan,* 354 Mass. 598, 607–608. The rule of the *Webster* case does not shift to the defence the burden of proving an alibi or lack of guilt. Cf. *Stump* v. *Bennett,* 398 F. 2d 111, 121–122 (8th Cir.), cert. den. 393 U. S. 1001. The Iowa rule discussed in the *Stump* case was construed in *Johnson* v. *Bennett,* 393 U. S. 253, 255, as "shifting to the defendant the burden of proving an alibi defense." See *S. C.* on remand, 414 F. 2d 50, 51–57 (8th Cir.).

A–38. The judge told the jury that a unanimous verdict was required to "assure . . . consideration of every bit of evidence." Stubbornness, he said, "has no place in the jury room; but, at the same time, each of you should vote as your conscience dictates, and your conscience alone." He told them of their duty to explain their own views to others of the jury and to consider the views of others. He pointed out the consequences of a mistrial and the lack of assurance that any other jury would do better. He urged them to "do your best, without prejudicing your own conscience, to reach a unanimous verdict." The defendants contend that this was improper inclusion, in the original charge, of the substance of *Commonwealth* v. *Tuey,* 8 Cush. 1, 2–3. The judge's remarks were appropriate statements of the duty of jurors. See *Commonwealth* v. *Rollins,* 354 Mass. 630, 636–639.

A–39. The judge discussed the crime of conspiracy. "That," he said, "is practically the simplest crime to commit and yet one of the most difficult to prove, at times." In context, it is plain that the judge was merely referring to the ease with which an agreement to commit a crime may be made and to the difficulty of proof of that agreement by direct and circumstantial evidence. We perceive no merit in the contention that this encouraged the jury "to shift or ameliorate the Commonwealth's burden of proof." The charge on that burden was plain.

A–40. In defining murder, the judge first read to the jury G. L. c. 265, § 1, and defined malice aforethought. He then said that if the jury believed "the contention of the Commonwealth, that this Deegan murder was planned in advance, it is murder in the first degree." He made it clear, however, that, if they saw fit to do so, they could return a verdict of murder in the second degree even if "there [was] a plan in advance to kill Deegan." He had previously said that "the jury have the power to decide the degree of murder." This adequately stated the law. See *Commonwealth* v. *Chase,* 350 Mass. 738, 743–744; *Commonwealth* v. *Rollins,* 354 Mass. 630, 633–635. Cf. *Commonwealth* v. *McCauley,* 355 Mass. 554, 557–561.

A–41. The judge charged that "once there is a conspiracy in existence, anything that any member of the conspiracy does or says in furtherance of the objective of that conspiracy binds all of them . . . . [O]nce the conspiracy is over, then what one does does not bind anyone else but himself." The judge was discussing only the crime of conspiracy and was addressing himself only to the conversations with individual defendants in 1967, when the conspiracies to kill Deegan and Stathopoulos had terminated. The language, as used, was not contrary to the principle quoted in *Commonwealth* v. *Stasiun,* 349 Mass. 38, 49, that a conspirator is not "as matter of law an

aider . . . in the perpetration of the crimes whose commission he has agreed with others to accomplish."

The judge shortly thereafter made clear the meaning of the term "accessory before the fact." That term, he said, "means that a person [who], before the killing of . . . Deegan, did *incite, procure, aid . . . advise . . . hire or command* the killers to do the killing. . . . Now, any one of these men . . . who in any way *helped to bring about the death of Deegan* by the one who killed Deegan, one or ones [who] *helped, incited* or *procured,* counseled *in the killing* . . . would be guilty. . . . [I]f you accept the contention of the Government . . . you would be warranted in returning a verdict of guilty of accessory before the fact" (emphasis supplied).

A–42. The judge charged that a "record of a conviction of a witness is admissible only on the question of his credibility. That is, the jury may consider the record on the question of whether to believe him" and give it "whatever weight they want. . . . An automobile violation, for example. I don't suppose anybody gives it any consideration at all. It doesn't prove anything." In this connection, the judge also charged, on the issue of credibility and reasonable doubt, that in considering truthfulness they might consider all that they knew about the person whose credibility was in issue "his past, his education, his intelligence, his reputation, anything you know about him." Under these instructions, to the full extent permitted by G. L. c. 233, § 21 (as amended through St. 1950, c. 426), the criminal record of each witness might be taken into account for all purposes relevant to credibility. These might include any bearing which the record might have on the witnesses' motive for testifying if that might affect credibility. Cf. *Commonwealth* v. *Stirling,* 351 Mass. 68, 72.

Baron's record included serious "automobile" violations (carrying a double-edged knife without a license in a motor vehicle, and an attempt to steal an automobile). Glavin's record included stealing an automobile. The judge, we think, cannot be regarded as referring to this type of offence in the portion of the charge now under discussion. Pretty clearly he was pointing out the difference in weight which might be given to serious offences and to automobile traffic offences. As each of these two witnesses had records of more serious offences, the reference to automobile offences (even if susceptible of misunderstanding as applying to crimes more than traffic violation) was not prejudicial.

A–43. On conspiracy the judge charged, "Conspiracy means that two or more people agree upon a plan to commit something that is criminal." Later, he said, "[E]ach of these defendants is to be considered as if he were the only defendant in this conspiracy case. Of course, he can't conspire with himself. . . . Two of them must be guilty. . . . One can't conspire with himself."

Baron, named in the conspiracy indictments as a coconspirator, had already pleaded guilty. Thus any one of the other defendants, on the evidence, could have been found guilty of conspiracy with him. The judge, as the context shows, was not instructing the jury that, regardless of the evidence, they must find two of the defendants guilty in any event.